[Cite as *State v. Andrews*, 2020-Ohio-2703.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 29260 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| WAYNE ANDREWS | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 17 12 4300 |

DECISION AND JOURNAL ENTRY

Dated: April 29, 2020

TEODOSIO, Judge.

{¶1} Defendant-Appellant, Wayne Andrews, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Late one evening, R.H. frequented two bars in Highland Square. She left the bars around 2:20 a.m. and, just after 5:20 a.m., the police discovered her passed out behind the wheel of her car at the intersection of Killian and South Arlington Roads. The police transported R.H. to the station, administered a breathalyzer, and determined that she was highly intoxicated. R.H. openly sobbed while being interviewed and mentioned several times that someone had threatened to hurt her. She also mentioned that a man had taken her keys and pushed her inside her car. The police did not press her for any details about her statements, however, as both her level of intoxication and emotional state detracted from the clarity of her statements. Once the officers finished questioning her, they made sure she had a ride home and impounded her car.

{¶3} Later in the evening that same day, R.H. contacted the police to report that a man had attacked her when she left the bars at Highland Square. She ultimately reported that the man had followed her to her car, taken her keys, driven her around against her will, and forced her to perform oral sex. She recalled waking up on a couch in an unfamiliar house with no memory of exiting her car or being brought inside. She further recalled grabbing her scattered belongings, going outside, finding her car, and driving off. Finally, she recalled being woken by the police when they found her passed out behind the wheel.

{¶4} R.H. did not know the name of the man who attacked her and was only able to provide the police with limited details about his appearance. She submitted to a sexual assault examination, however, and male DNA was discovered on her arms, on her neck, and on a beer bottle the police found inside her car. Forensic analysts then searched a law enforcement database for matching profiles and determined that Mr. Andrews could not be excluded as the source of the DNA they had discovered. After speaking with him and investigating further, the police arrested him in connection with R.H.'s abduction.

{¶5} A grand jury indicted Mr. Andrews on one count of kidnapping, one count of rape, three counts of abduction, and two counts of sexual battery. The State dismissed one abduction count before trial, and the remaining counts were tried to a jury. After extended deliberations, the jury returned a partial verdict. It found Mr. Andrews not guilty of kidnapping, guilty of two counts of abduction, and guilty of one count of sexual battery. It was unable to reach a verdict on the remaining counts of rape and sexual battery. Those counts were later dismissed at the State's request.

{¶6} The trial court sentenced Mr. Andrews to five years in prison on his sexual battery count and three years in prison on each of his abduction counts. It ordered the prison term on his

sexual battery count to run consecutively with the prison term on one of the abduction counts. It ordered the prison term on the remaining abduction count to run concurrently with that sentence. Consequently, Mr. Andrews received a total sentence of eight years in prison.

{¶7} Mr. Andrews now appeals from his convictions and raises four assignments of error for our review. For clarity of review, we rearrange his assignments of error.

II.

**ASSIGNMENT OF ERROR THREE**

WAYNE ANDREWS WAS DENIED DUE PROCESS BECAUSE HIS CONVICTIONS FOR SEXUAL ASSAULT AND ABDUCTION WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶8} In his third assignment of error, Mr. Andrews argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶9} This Court has stated:

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶10}  R.H. testified that she drove herself to Highland Square late one evening to frequent two bars where she knew either the bartender or the manager.  She parked on a side street off a back alley to the bars and estimated that she arrived at the first bar around 11:30 or 11:45 p.m.  She indicated that she ordered two shots and a beer at the first bar before walking over to the second bar and ordering two mixed drinks.  She shared at least one of the drinks with a friend and spent time socializing with a few people at each bar while she enjoyed her drinks.  After closing her tab at the second bar, she returned to the first bar and stayed a bit longer before deciding it was time to leave.  Realizing that she had consumed too many drinks to drive, she tried calling a friend who lived nearby to see if she could walk to his house.  The friend did not answer, however, so R.H. decided she would sleep in her car for a while.  She then exited through the back door of the bar, took out her keys, and walked through the back alley towards her car.

{¶11}  R.H. testified that, as she was walking to her car, a man came up behind her and snatched her keys from her hand.  The man demanded that she get into her car, and R.H., who was terrified, entered the car and slid over to the passenger's side.  Recordings from two cameras facing the alley behind the bars captured R.H. walking to her car, and the State introduced those recordings during its case-in-chief.  The recordings depicted R.H. leaving the bar at 2:23 a.m.  They showed a man walking several feet behind her and quickly closing the gap between them as he followed her.  They further showed the man pulling even with her just as she walked past the corner of a building and disappeared from view.

{¶12}  R.H.'s memories of the remainder of her evening were fragmented.  She recalled the man driving her around in circles for a long while as she pleaded to be let go.  She recalled breaking her special keychain (i.e., a Pokemon ball) when she unsuccessfully tried grabbing for her keys.  She recalled trying to use her cell phone more than once and the man either smacking it

from her hand or slamming on the brakes, causing her to hit her forehead on her dashboard. She also recalled him pouring a beer on her and repeatedly calling her a "crazy, stupid, drunk bitch." R.H. testified that she carried a knife in her purse whenever she went out alone. She remembered removing the knife from her purse and unsheathing it to try to deter the man. The man took the knife from her, however, and R.H. could not remember what happened to it after he did so.

{¶13} R.H. testified that, at some point, the man pulled to the side of the road and forced her to perform oral sex. She explained that she did not try to escape when the car stopped because she did not know where they were and was too scared. She described how the man grabbed the back of her neck and pulled her down to where he had exposed his penis. She did not know how long the oral sex lasted and stated that, after a while, everything went dark. She next recalled waking up on a small couch in a strange house. Although she was still wearing her pants and bra, her shirt had been removed and she was not wearing any shoes. R.H. testified that she found her shirt on the floor next to her, her purse scattered on a nearby table, and her keys on a counter by the door. After grabbing her things, she fled through the back door, walked around the house, and spotted her car. She then drove away. R.H. testified that, shortly thereafter, everything went dark again, and she next remembered the police waking her up.

{¶14} A few minutes after 5:20 a.m., Deputy Michael Conley pulled behind R.H.'s car at the intersection of Killington and South Arlington Roads. The car did not move when the light turned green, so the deputy activated his lights. He testified that the lights appeared to wake the driver, who then pulled off to the side of the road. Upon his approach, the deputy found R.H. behind the wheel. He testified that she was crying, extremely upset, and noticeably intoxicated. As to the latter, he stated that she was emitting a strong odor of alcohol, slurring her speech, and

making little sense. After she failed the field sobriety tests he administered at the scene, he took her to the police station and had her car towed.

{¶15} Deputy Conley testified that R.H. took a breathalyzer at the police station and the test revealed that her blood alcohol content was more than three times the legal limit. He confirmed that she remained extremely upset throughout their interview, even after he told her that she would be released. The State played R.H.'s recorded interview for the deputy and, upon review, he agreed that she had said a few things about someone taking her keys and threatening to hurt her. Yet, it was not his opinion that she had been trying to tell him something important. The deputy testified that it was difficult for him to understand R.H. and "it just sounded like she was mumbling and blubbering" in the manner of intoxicated individuals. He stated that R.H. never said who had hurt her and, when he asked where she had been for the last few hours, she had said she was with friends. Believing that she was simply intoxicated, the deputy released her at the conclusion of their interview.

{¶16} R.H. testified that she spoke with her mother later that evening, and her mother convinced her to report the sexual assault. She then called the police, and a detective came to her home to take her statement and transport her to the hospital for an exam. The attending physician and the sexual assault nurse examiner who met with R.H. both testified. The physician indicated that R.H. arrived at 10:09 p.m. and reported that an unknown man had forced her into her car, had driven her to an unfamiliar area, and had forced her to perform oral sex on him. The physician noted that R.H. had a bruise to her right forehead and an abrasion on her right arm. R.H. did not have any other visible injuries, but the nurse examiner testified that sexual assaults commonly occur without injury. The nurse examiner stated that R.H. was tearful throughout their interview, as she described how she was abducted and sexually assaulted. She testified that they took a urine

sample from R.H. because R.H. did not believe that she had consumed enough alcohol to warrant her level of intoxication and the blackout periods she had experienced. Though R.H. did not test positive for the drug commonly associated with sexual assaults (i.e., GHB), the attending physician testified that the drug is undetectable after about four to six hours. By the time R.H. was tested, a much longer time period had elapsed.

{¶17} Several witnesses testified regarding the observations they made about R.H. while she was at the bars at Highland Square. The manager of the first bar, who was R.H.'s long-time friend, recalled serving her roughly three drinks while she was at his bar. He testified that he recalled her coming to the bar, leaving at some point, and returning later that evening. He further testified that she was alone each time and did not appear to be intoxicated the last time that he saw her. The manager at the second bar was familiar with R.H. as a regular customer and recalled serving her two drinks that evening. The DJ at that same bar was a good friend of R.H.'s and testified that she chatted with him that evening and did not appear to be intoxicated. Both the manager and the DJ at the second bar were familiar with Mr. Andrews, as he often sang karaoke there on Monday evenings. The manager recalled Mr. Andrews being at the bar that night, but never saw him talking to R.H. Likewise, the DJ never saw R.H. and Mr. Andrews together.

{¶18} Detective Brian Breeden became the lead investigator in this matter once the Summit County Sheriff's Department inherited the investigation. As part of his investigation, the detective secured three video-recordings of interest. Two of the recordings, previously discussed herein, depicted R.H. leaving the bars at 2:23 a.m. and a man pursuing her from behind. The third recording depicted the sidewalk in front of the bars. It showed a man walking into view at 1:38 a.m. and approaching two females who were standing outside. One of the females appeared visibly intoxicated, and, as she stumbled around, the man approached her and attempted to lead her away.

The other female then repeatedly attempted to separate the two by inserting herself between the man and her intoxicated friend. Once the second female succeeded in separating her friend from the man, she led her friend away. The man then briefly looked at his cell phone before entering the bar at 1:48 a.m. Detective Breeden testified that the man depicted in the third recording was the same one who followed R.H. into the back alley 35 minutes later (i.e., Mr. Andrews).

{¶19} Because R.H.'s car was impounded upon her arrest, Detective Breeden was able to have it towed to the crime lab for processing. Inside the car, the police found R.H.'s purse and, inside the purse, they found a knife sheath. No knife was found inside the car, but the police did find a little ball keychain that appeared to have been broken off. They also found a Miller High Life beer bottle, which they sent to the Bureau of Criminal Investigation ("BCI") for testing.

{¶20} Forensic analysts from BCI swabbed the beer bottle found in R.H.'s car. They also received the swabs taken during her sexual assault exam. The analyst who tested those items testified that the swabs taken from the back of R.H.'s neck, her right forearm, and her left forearm all contained a mixture of two DNA profiles. The first profile was consistent with R.H.'s profile, and the second was consistent with Mr. Andrews' profile. Likewise, swabs taken from the outside and mouth of the beer bottle contained two profiles that were consistent with R.H.'s profile and Mr. Andrews' profile. Detective Breeden testified that it was the DNA results that allowed him to identify Mr. Andrews as a person of interest.

{¶21} Detective Breeden spoke with Mr. Andrews three times during his investigation. Their first conversation took place over the phone and occurred eight weeks after R.H.'s abduction. Their second conversation also took place over the phone and occurred about two weeks later. Finally, their third conversation occurred one day after that, at the police station, following Mr. Andrews's arrest.

{¶22} Detective Breeden indicated that Mr. Andrews did not remain consistent when recounting the details of his evening on the night in question. Mr. Andrews initially told the detective that he had been living in California for the last sixth months and had not even been to Ohio. When the detective told him there was a video-recording placing him at the scene, however, Mr. Andrews recalled that he had been to Highland Square, but had left with a friend, B.C., around midnight. He recalled being introduced to a girl at the bar, but he denied taking her car or engaging in any inappropriate touching.

{¶23} After Detective Breeden informed Mr. Andrews that his DNA had been found on R.H., Mr. Andrews remembered her. He claimed that she had used a different name to introduce herself, but he accurately described her appearance and her car. Mr. Andrews told the detective that R.H. sat on his lap at the bar and they kissed, but he denied any additional physical contact. He described R.H. as extremely intoxicated and said that she either snorted some type of narcotic or took some type of a pill at the bar. Nevertheless, he claimed that he then accepted a ride from her because they were both ready to leave at the same time. He stated that R.H. drove and he quickly became concerned for his safety as a result of her erratic behavior. He described how she pulled out a knife out at one point and told him she had used it to cut people. According to Mr. Andrews, he began taking videos of R.H. with his phone in case something happened to him. Mr. Andrews was never able to provide the detective with those videos, however, as he said he had taken them on his old phone and could not retrieve them. When asked about the beer bottle the police found in the car, Mr. Andrews claimed that it belonged to R.H. and that he never drank beer.

{¶24} Late during his second interview, Mr. Andrews admitted that he drove R.H.'s car for a short while. He claimed that they stopped at a gas station, and he got out of the car because R.H. was driving so erratically and waving around her knife. He claimed that he took the knife

from her and disposed of it somewhere in that area. He then convinced her to let him drive for a while so that he could safely arrive at his destination. According to Mr. Andrews, he drove the car to a spot near the intersection of Arlington and East Market Streets before he got out, walked for a bit, and got an Uber to take him to his friend P.Y.'s house. During his final interview, he stopped altogether denying that he and R.H. engaged in oral sex in the car. Instead, he indicated that he could not say whether the oral sex had occurred because he too had been drinking and things were blurry. He did state several times, however, that R.H. was the one who came on to him.

{¶25} Detective Breeden spoke with Mr. Andrews' friend, P.Y., but she was unable to confirm that he came to her house that evening. The detective also was unable to confirm that Mr. Andrews had been at a gas station with R.H. He testified that he watched all the available recordings from that gas station around the times Mr. Andrews possibly could have been there, but none of the recordings showed him, R.H., or her car. Further, the detective was unable to find any record of Mr. Andrews having ordered an Uber at the time he claimed to do so. The only Uber that Mr. Andrews ordered that morning was at 6:17 a.m., almost one full hour after the police found R.H. in her car.

{¶26} Mr. Andrews relied on cross-examination at trial and did not testify in his own defense. On cross-examination, R.H. admitted that her testimony was not entirely consistent with her prior statements. For example, she acknowledged that she did not immediately disclose all of the details of her abduction and/or sexual assault when initially being interviewed. She also agreed that she may have been mistaken about certain details, such as how far she was from her car when Mr. Andrews took her keys or whether he was wearing a watch. Although R.H. claimed that she never saw Mr. Andrews before he accosted her, the defense was able to show that his cell phone

number appeared as an incomplete, incoming call on her cell phone at 2:09 a.m. R.H. could not explain why his number appeared in her phone records. Nor could she explain why her urine screen detected cocaine in her system. Finally, she could not explain why her DNA was found on the mouth of the beer bottle in her car, given her testimony that it was not her beer and that she never drank that kind of beer.

{¶27} Mr. Andrews argues that the jury lost its way when it convicted him because R.H.'s statements lacked credibility and the evidence weighed more heavily in favor of the conclusion that he did not engage in any illegal conduct. He notes that R.H.'s testimony was contrary to the physical evidence and inconsistent, as her story evolved each time she was interviewed by a different person. He points to the evidence that, at first, she told the police she had been with friends for a few hours before her arrest. He also points to the evidence that she was highly intoxicated and had cocaine in her system. Mr. Andrews argues that the evidence he called R.H.'s cell phone before they left the bar belied her claim that she had never met him. Further, he argues that the appearance of her DNA on the mouth of the beer bottle in her car belied her claim that she had not been drinking from it. Because R.H. was an unreliable witness and her testimony was the only evidence the State produced in support of his convictions, Mr. Andrews argues that his convictions are against the manifest weight of the evidence.

{¶28} Having reviewed the record, we cannot conclude that the jury clearly lost its way when it found Mr. Andrews guilty of abduction and sexual battery. *See Otten*, 33 Ohio App.3d at 340. Without a doubt, there were certain inconsistencies in R.H.'s testimony. She did not immediately disclose everything that happened, and she had difficulty recalling various details. Yet, she explained that she was disoriented when she initially spoke with the police and struggling with the realization that she had been sexually assaulted. The recording of her initial interview

showed her hyperventilating at certain points and openly sobbing for the duration of the interview. Moreover, it captured her saying more than once that someone had threatened to hurt her and had taken her keys. The State presented the testimony of an expert in trauma counseling who testified that it is common for victims of sexual assault to delay reporting and to experience guilt and/or shame in connection with their assault. The expert also testified that trauma negatively impacts memory and victims can have difficulty describing their experiences. Accordingly, the jury reasonably could have concluded that R.H.'s level of intoxication, in conjunction with the trauma she experienced, made it difficult for her to recall the exact order of the events that occurred or certain, specific details.

{¶29} Although R.H. was not entirely consistent in her recounting of the events, the State presented physical evidence to corroborate her testimony. R.H. said she slammed her head on her dashboard when Mr. Andrews braked too hard, and she had a bruise on her forehead in that location. She said that Mr. Andrews grabbed the back of her neck as he pulled her down to perform oral sex, and his DNA was found at that location. She said that her Pokemon keychain broke when she tried to grab for her keys, and the police found the broken keychain inside her car. Finally, she said that Mr. Andrews took her knife from her after she unsheathed it, and the police found the sheath, but not the knife, when searching her car.

{¶30} While Mr. Andrews' cell phone number appeared in R.H.'s phone records, her phone records also showed that she Googled the non-emergency number for the Akron Police Department and placed two calls to that number at 4:30 a.m. Detective Breeden testified that the non-emergency number only connected a caller to an automated system, but the jury reasonably could have concluded that R.H. attempted to contact the police because she needed help. Further, the jury reasonably could have rejected Mr. Andrews' version of the events, given that it also

conflicted with the physical evidence and suffered from numerous inconsistencies. The jury heard testimony that Mr. Andrews changed his story multiple times. At various junctures, he claimed that (1) he had not been in Ohio for six months, (2) he had been to Highland Square, but had left close to midnight, (3) he had met a girl at the bar, but had nothing more to do with her, (4) he had met R.H., kissed her, and accepted a ride from her, but definitely did not engage in any sexual activity with her, (5) he had driven R.H.'s car at some point because she was acting so erratically that he feared for his life, and (6) he had an inability to recall whether he engaged in sexual activity with R.H. because they were both drunk and his memory was fuzzy. Much like R.H., Mr. Andrews claimed that he never drank beer in her car, but his DNA was also found on the bottle. Further, Detective Breeden was unable to substantiate his claims that he and R.H. stopped at a gas station, that he called for an Uber, or that he went to a friend's house.

{¶31} The jury here was essentially presented with two conflicting versions of the events that occurred on the night in question. As the trier of fact, it was in the best position to evaluate the credibility of the witnesses and was "'free to believe all, part, or none of the testimony of each witness.'" *State v. Clark*, 9th Dist. Wayne No. 14AP0002, 2015-Ohio-2978, ¶ 24, quoting *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35. "'A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact.'" *State v. Zaree*, 9th Dist. Lorain No. 17CA011111, 2017-Ohio-9081, ¶ 5, quoting *State v. Haydon*, 9th Dist. Summit No. 19094, 1999 WL 1260298, *7 (Dec. 22, 1999). Likewise, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. This Court has carefully reviewed the record in this matter, and Mr. Andrews has not shown that this is the exceptional case where the jury lost its

way by convicting him.  *See Otten*, 33 Ohio App.3d at 340.  Accordingly, his third assignment of error is overruled.

## ASSIGNMENT OF ERROR ONE

WAYNE ANDREWS WAS DENIED HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE ADMISSION OF UNDULY PREJUDICIAL OTHER ACTS EVIDENCE, IN VIOLATION OF EVID.R. 403 AND 404(B) AND THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶32}  In his first assignment of error, Mr. Andrews argues that the trial court abused its discretion when it allowed the State to introduce other acts evidence.  Specifically, he challenges the admission of a recording that purportedly showed him harassing an intoxicated, white female shortly before he followed R.H. to her car.  Upon review, we reject his argument.

{¶33}  "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Evid.R. 404(B).  Trial courts conduct a three-step analysis in determining whether to admit other acts evidence:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.  Evid.R. 401.  The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).  The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*State v. Baskerville*, 9th Dist. Summit No. 28148, 2017-Ohio-4050, ¶ 7, quoting *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20.

{¶34}  This Court has consistently held that "'[t]he admission or exclusion of evidence rests soundly within the trial court's discretion.'"  *State v. Powell*, 9th Dist. Lorain No. 12CA010284, 2017-Ohio-4030, ¶ 16, quoting *State v. Scheck*, 9th Dist. Medina No. 05CA0033-M, 2006-Ohio-647, ¶ 13.  We therefore review a trial court's decision regarding the admission or exclusion of evidence for an abuse of discretion.  *Powell* at ¶ 16.  An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable."  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).  When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court.  *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶35}  As previously noted, the State played three video-recordings during Detective Breeden's testimony.  The third recording showed two females standing on the sidewalk in front of the bars and a male approaching them just after 1:30 a.m.  It showed the male attempting to lead away one of the females, who was clearly intoxicated, and the other female intervening.  Once the females walked away from the man, it showed him heading into the bar at 1:48 a.m.  Detective Breeden testified that the man in the recording was the same one who followed R.H. out of the bar at 2:23 a.m. (i.e., Mr. Andrews).  The trial court determined that the recording was relevant and that its probative value was not outweighed by its prejudicial effect.

{¶36}  Mr. Andrews argues that the trial court abused its discretion when it admitted the third recording in the absence of context or corroboration.  He asserts that there was no proof he was the male in the recording or that it depicted a non-consensual encounter.  He notes that he was never asked about the recording, the recording was not equipped with sound, and neither of the females depicted therein testified.  Accordingly, he argues that Detective Breeden's testimony about the recording amounted to nothing more than his subjective interpretation of what it showed.

Mr. Andrews claims that the admission of the recording was extremely prejudicial because it cast him as a pervert or predator and merely served to underscore racial stereotypes about black men harassing white women.

{¶37} Initially, we note that Mr. Andrews took inconsistent positions in the court below when he objected to the admission of the third recording. After the State moved to admit the recording as evidence of his prior bad acts, he filed a written response and wrote: "[T]he State is seeking to introduce a video tape showing [Mr. Andrews] conversing and interacting with females * * *. *In fact, [Mr. Andrews] knew one of the girls*." (Emphasis added.) He, therefore, conceded that he was the man in the recording and objected to its admission solely because it could be interpreted in different ways and its prejudicial impact substantially outweighed its probative value. On the first day of trial, however, he argued that the admission of the recording would be prejudicial because no one would be testifying that he was the man who appeared in it and "we don't have any idea of who these women are or whether he even knew them." Because neither the State, nor the trial court drew attention to the inconsistent positions taken by Mr. Andrews, this Court will not treat as dispositive his initial admission that he was the man in the recording. Nevertheless, to the extent he now claims that he never admitted to that fact, we note that his own pretrial filings undercut his assertion.

{¶38} Upon review of the record, we cannot conclude that the trial court abused its discretion when it admitted the third recording. First, the recording was relevant in several respects. *See Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, at ¶ 20, citing Evid.R. 401. It showed what time Mr. Andrews arrived at the bar and also tended to show that he tried to lead an intoxicated female away from the bar shortly before he abducted R.H. Second, the State introduced the recording for a legitimate purpose. *See Williams* at ¶ 20. It helped establish the timeline of

events that occurred and served as evidence of Mr. Andrews' intent, motive, and/or plan that evening. *See* Evid.R. 404(B). Finally, the record supports the conclusion that the recording was not substantially more prejudicial than probative. *See Williams* at ¶ 20. Much of Mr. Andrews' argument on this final point concerns the State's failure to corroborate Detective Breeden's testimony about the recording. Apart from that testimony, he argues, there was no evidence that he was the man in the recording or that it actually depicted him harassing a female. Yet, his concerns speak to the weight of the evidence rather than its admissibility. *See State v. Jackson*, 9th Dist. Summit No. 28192, 2017-Ohio-635, ¶ 11. Detective Breeden was familiar with Mr. Andrews' appearance after having interviewed him. He also was able to compare the walk, the clothing, and the appearance of the man following R.H. outside the bar in the first and second recordings with the walk, clothing, and appearance of the man in the third recording. His familiarity with Mr. Andrews, his observations, and the information he garnered during his investigation provided an adequate foundation for the admissibility of the third recording. *See id.* at ¶ 10-11.

{¶39} To the extent Mr. Andrews claims that Detective Breeden's description of the third recording was inflammatory or fed into racial stereotypes, the record does not support his argument. The State only asked the detective a few questions about the third recording. He confirmed the time that Mr. Andrews came into view and the fact that he was never able to ascertain the identity of the two females involved. The only statement he made regarding Mr. Andrews' behavior was that "it appeared * * * [one female] was trying to separate the other intoxicated female from [Mr. Andrews] * * *." He never categorized Mr. Andrews' behavior as harassment or used any other type of inflammatory phraseology. Moreover, the jurors were able to view the recording themselves and draw their own conclusions about Mr. Andrews' behavior.

{¶40} Upon review, Mr. Andrews has not shown that the trial court abused its discretion when it admitted the third recording. As such, his first assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

WAYNE ANDREWS WAS DENIED HIS RIGHTS TO DUE PROCESS AND FAIR TRIAL BY THE EXCLUSION OF EVIDENCE OF THE VICTIM'S MENTAL HISTORY, IN VIOLATION OF EVID.R. 401 AND 613, AND THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 10 AND 16, OF THE OHIO CONSTITUTION.

{¶41} In his second assignment of error, Mr. Andrews argues that the trial court abused its discretion when it denied his request to introduce evidence about R.H.'s mental health history. We do not agree.

{¶42} As previously noted, the decision to admit or exclude evidence is one that lies within the sound discretion of the trial court, and thus, will be reviewed for an abuse of discretion. *See Powell*, 2017-Ohio-4030, at ¶ 16. An abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore*, 5 Ohio St.3d at 219. When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons*, 66 Ohio St.3d at 621.

{¶43} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Though relevant evidence is generally admissible, Evid.R. 402, its exclusion is mandatory "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶44} Mr. Andrews had the opportunity to cross-examine R.H. about a variety of topics. He asked her about the inconsistencies in her statements. He questioned her inability to recall certain details. Further, he confronted her with pieces of physical evidence that appeared to

conflict with her version of the events. He did not, however, ask her about her mental health history. Instead, when the sexual assault nurse examiner testified, he sought to ask her about a "self-diagnosed mental illness" R.H. apparently reported during her examination. He claimed that the information was relevant because it would corroborate his statements that R.H. had acted "bipolar" and "crazy" in the car. Because the trial court determined that the prejudicial effect of the evidence substantially outweighed its probative value, it excluded that evidence from trial.

{¶45} Mr. Andrews argues that the trial court abused its discretion when it excluded the evidence about R.H.'s self-reported mental illness. According to him, that evidence bore upon her credibility and spoke to her inability to accurately perceive the events that occurred herein. Because the State's entire case depended upon the jury finding R.H. to be a credible witness, Mr. Andrews argues, the exclusion of that evidence prejudiced his trial.

{¶46} The "self-diagnosed mental illness" that R.H. apparently reported was contained in certain medical records from her sexual assault examination. Though the appellate record includes some of her medical records, it does not include any records wherein she diagnosed herself with a mental illness. According to the State, Mr. Andrews failed to proffer those particular records for purposes of his appeal. Though he concedes that the State is correct, Mr. Andrews nevertheless argues that the record contains enough information for this Court to address his argument.

{¶47} As the appellant, it was Mr. Andrews' responsibility "to ensure that the record on appeal contain[ed] all matters necessary to allow this Court to resolve the issues on appeal." *State v. Farnsworth*, 9th Dist. Medina No. 15CA0038-M, 2016-Ohio-7919, ¶ 16. We have consistently held that, "in the absence of portions of the record necessary for our review, we must presume regularity in the trial court's proceedings and affirm its ruling." *State v. Jalwan*, 9th Dist. Medina No. 09CA0065-M, 2010-Ohio-3001, ¶ 12. Because the record does not contain the medical

records at issue herein, we cannot determine whether the trial court erred when it excluded them. While Mr. Andrews invites us to review his argument based strictly on the discussion the parties and the lower court had about the records, we decline to do so. Mr. Andrews did not read into the record any of the statements that R.H. apparently made to the nurse examiner about her mental health history. Nor did he proffer what the nurse examiner's testimony about those statements would have been. Absent a record of R.H.'s actual statements or the context in which she made them, we have no choice but to presume regularity in the proceedings. *See id.* Accordingly, Mr. Andrews' second assignment of error is overruled.

## ASSIGNMENT OF ERROR FOUR

WAYNE ANDREWS WAS DENIED DUE PROCESS WHEN THE TRIAL COURT IMPOSED NON-MERGED, CONSECUTIVE SENTENCES IN VIOLATION OF THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION.

{¶48} In his fourth assignment of error, Mr. Andrews argues that the trial court committed various sentencing errors. First, he argues that the court should have merged his abduction conviction under R.C. 2905.02(A)(2) with one of his remaining convictions. Second, he argues that the court erred when it ordered him to serve two of his prison terms consecutively. We separately address each issue.

Allied Offenses

{¶49} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article 1 of the Ohio Constitution, which prohibits multiple punishments for the same offense." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 23. The statute provides, in relevant part:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(A), (B).    The Supreme Court of Ohio has held that when a defendant's conduct supports multiple offenses, that defendant may be convicted of all offenses if "(1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, paragraph three of the syllabus.

{¶50} Mr. Andrews was convicted of two counts of abduction under two separate subdivisions of R.C. 2905.02.  Those two subdivisions prohibit any person from knowingly, and without privilege to do so, using force or the threat of force to (1) "remove another from the place where the other person is found," R.C. 2905.02(A)(1), or (2) "restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear," R.C. 2905.02(A)(2).  At his sentencing hearing, Mr. Andrews argued that his abduction convictions should merge because he engaged in a single course of conduct when he forced R.H. into her car and kept her there against her will.  The trial court rejected his argument and refused to merge his convictions.

{¶51}  On appeal, Mr. Andrews primarily argues that the trial court erred when it failed to merge his conviction for abduction under R.C. 2905.02(A)(2) with his conviction for sexual battery.  Yet, the record reflects that he never sought the merger of those two offenses in the lower court.  Because he neither asserted an allied offense argument with respect to those offenses, nor

objected to the trial court's refusal to merge them, he forfeited all but plain error. *See State v. Daniels*, 9th Dist. Wayne No. 17AP0036, 2020-Ohio-1176, ¶ 37. Mr. Andrews has not set forth a plain error argument in his appellate brief. Although he has attempted to raise plain error in his reply brief, "an appellant may not assert a claim of plain error for the first time in a reply brief." *State v. Irvine*, 9th Dist. Summit No. 28998, 2019-Ohio-959, fn. 1. Moreover, his argument amounts to nothing more than a blanket statement that plain error occurred. This Court will not construct a plain error argument on his behalf. *See Daniels* at ¶ 37. Accordingly, we reject his argument that his abduction and sexual battery convictions ought to have merged as allied offenses of similar import.

{¶52} Mr. Andrews also briefly argues that his two abduction convictions ought to have merged because they were "part and parcel of a single act * * *." Yet, the record supports the conclusion that the two offenses were committed separately and with a separate animus. *See* R.C. 2941.25(B). The first count of abduction occurred when Mr. Andrews initially forced R.H. into her car and removed her from the scene. *See* R.C. 2905.02(A)(1) (using force to remove another from the place where the other is found). The second count of abduction occurred later when he kept her in the car for several hours, ignored her pleas to let her go, slapped her phone from her hand, caused her to hit her head on the dashboard, forced her to perform oral sex on him, and took her to an unfamiliar house. *See* R.C. 2905.02(A)(2) (using force to restrain another's liberty under circumstances that risk physical harm to the other or place her in fear). Because his two abduction counts were committed separately and with a separate animus, the trial court did not err when it refused to merge them. *See State v. Person*, 9th Dist. Summit No. 27600, 2016-Ohio-681, ¶ 32. We reject Mr. Andrews' argument to the contrary.

Consecutive Prison Terms

**{¶53}** An appellate court's standard for review of a felony sentence is not whether the sentencing court abused its discretion. R.C. 2953.08(G)(2). The Supreme Court of Ohio has held that "an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1; R.C. 2953.08(G)(2). "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

**{¶54}** R.C. 2929.14(C)(4) requires trial courts to make certain findings before imposing consecutive sentences:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

In order to impose consecutive sentences, "a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry * * *." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, syllabus. Yet, it is not required "to explain its findings before imposing consecutive sentences." *State v. Brundage*, 9th Dist. Summit No. 29477, 2020-Ohio-653, ¶ 17, citing *Bonnell* at syllabus. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29.

{¶55} The trial court imposed consecutive sentences upon Mr. Andrews for his abduction conviction under R.C. 2905.02(A)(1) and his sexual battery conviction under R.C. 2907.03(A)(2). Mr. Andrews does not dispute that it made the required findings under R.C. 2929.14(C)(4) at his sentencing hearing and in its sentencing entry. His argument is that its findings were cursory and that it failed to engage any meaningful analysis. Yet, the court was not required to explain its findings before it issued consecutive sentences. *Brundage* at ¶ 17, citing *Bonnell* at syllabus. The court described Mr. Andrews as "a predator" who "prey[ed] on the vulnerable, [and] pick[ed] someone weak, probably unlikely to report any incident and probably unlikely to remember * * *." It made each of the findings required by R.C. 2929.14(C)(4) at the sentencing hearing, and those findings are reflected in its sentencing entry. Accordingly, we cannot conclude that the court erred when it ordered Mr. Andrews to serve two of his sentences consecutively. *See Brundage* at ¶ 18. Mr. Andrews' fourth assignment of error is overruled.

III.

{¶56} Mr. Andrews' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

JEREMY A. VEILLETTE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.