[Cite as *State v. Kirkland*, 2022-Ohio-4325.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 19CA011485 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ELLIOTT L. KIRKLAND | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 16CR094753 |

DECISION AND JOURNAL ENTRY

Dated: December 5, 2022

SUTTON, Judge.

{¶1} Defendant-Appellant, Elliot Kirkland, appeals from the judgment of the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} Sometime around 1:30 a.m. on August 29, 2016, someone broke into J.H.'s apartment, shot him three times, and left him to die on his bedroom floor. The police received a 911 call about his body later that morning. When officers arrived, they found two females waiting outside: Codefendant One and L.T. The police discovered J.H.'s apartment had been ransacked and noticed several suspicious items of property in the backseat of Codefendant One and L.T.'s car. While the females initially denied any involvement in the shooting, they ultimately gave the police information that led the police to suspect the women, Mr. Kirkland, and a second man, Codefendant Two, had been involved in J.H.'s murder.

{¶3} The police arrested Mr. Kirkland and Codefendant Two later that same day. Although Codefendant Two had remained in the area, the police found Mr. Kirkland near Cleveland where he had purchased a bus pass and was trying to leave Northeast Ohio. Their investigation ultimately uncovered surveillance footage and text message conversations that allowed them to piece together the events surrounding J.H.'s murder. The police discovered Mr. Kirkland procured a gun a few days before the murder, purchased bullets, and expressed an interest in robbing J.H. They also learned that Mr. Kirkland, who had been having money problems before J.H.'s murder, paid for items with a $100 bill and said he had several thousand dollars in cash after the murder. While the police were never able to recover the gun used to kill J.H., they discovered the brand and size of the bullets used during the shooting were an exact match for the bullets purchased by Mr. Kirkland a few days earlier.

{¶4} Mr. Kirkland was arrested on August 29, 2016, but not indicted until November 2, 2016. His original indictment charged him with aggravated murder, murder, felony murder, two counts of aggravated robbery under alternative theories, two counts of aggravated burglary under alternative theories, two counts of felonious assault under alternative theories, burglary, obstructing justice, multiple firearm specifications, and multiple specifications for being a repeat violent offender. Despite the complexity of the charges against him, Mr. Kirkland was initially insistent upon going to trial within his ninety-day speedy trial time. He refused to execute any time waivers and instructed defense counsel to withdraw any motions that might extend his speedy trial time, including motions for discovery. The trial court scheduled the trial for a mere eight days after his first pretrial but met with Mr. Kirkland and the parties again the day before the scheduled trial. At that time, both the trial court and defense counsel expressed significant concerns about defense counsel's ability to litigate the case. After learning his trial only had to commence but not

conclude within the ninety-day timeframe to satisfy the speedy trial statute, Mr. Kirkland agreed to a limited time waiver and continuance. The parties selected a new trial date of April 18, 2017, and Mr. Kirkland agreed to waive time until May 1, 2017, in the event scheduling issues later arose.

{¶5}   On January 13, 2017, the State issued a supplemental indictment. The supplemental indictment charged Mr. Kirkland with capital murder and resulted in new defense counsel being appointed and the trial being delayed until January 7, 2019. The State ultimately substituted the newly indicted capital murder charge for Mr. Kirkland's original aggravated murder charge and dismissed his charge for obstructing justice. Mr. Kirkland elected to have the court try his weapons under disability charge and his repeat violent offender specifications, and a jury heard his remaining charges. The jury and the trial court ultimately found him guilty on each of his counts and specifications. Following the mitigation phase of his trial, the jury recommended a sentence of life in prison without the possibility of parole. Mr. Kirkland was then sentenced according to law.

{¶6}   Mr. Kirkland now appeals from his convictions and raises three assignments of error for review.

II.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY ALLOWING THE STATE TO PROSECUTE [MR. KIRKLAND] FOR THE DEATH PENALTY BECAUSE THE DEATH SPECIFICATION WAS VINDICTIVELY ADDED AFTER [MR. KIRKLAND] INITIALLY ASSERTED HIS SPEEDY TRIAL RIGHTS.

{¶7}   In his first assignment of error, Mr. Kirkland argues his due process rights were violated when the State charged him with capital murder after he invoked his speedy trial rights.

According to Mr. Kirkland, he was a victim of prosecutorial vindictiveness. Upon review, this Court rejects his argument.

{¶8} Mr. Kirkland acknowledges he did not argue prosecutorial vindictiveness in the lower court or otherwise raise a due process argument when he was charged with capital murder by way of a supplemental indictment. He asks this Court to review his argument for plain and structural error. Although he did not receive the death penalty, Mr. Kirkland argues he was prejudiced by the addition of the capital murder charge because it affected the guilt and sentencing phases of his trial. He claims that (1) jurors who are selected to serve in capital cases "tend to be more biased in believing the defendant is guilty[,]" and (2) the sentencing proceedings were "tilted toward him not ever receiving a chance at parole" because, when compared to the death penalty, life in prison without the possibility of parole appears to be a more lenient sentencing option.

{¶9} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). The plain error doctrine requires there to be: (1) a deviation from a legal rule; (2) that is an obvious defect in the trial; and (3) that affects the appellant's substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the third element, an appellant must show that the error affected the outcome of his trial. *Id.* "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶10} Structural error is limited to certain constitutional errors that "affect[] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." *State v. Davis*, 127 Ohio St.3d 268, 2010-Ohio-5706, ¶ 22, quoting *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, ¶ 17. They are generally "deemed prejudicial per se" such that

reversal is automatic. *Davis* at ¶ 22. However, "the plain-error rule still applies to errors that were never objected to at trial, even if those errors can be classified as structural." *State v. McAlpin*, Slip Opinion No. 2022-Ohio-1567, ¶ 66. *See also State v. Bond*, Slip Opinion No. 2022-Ohio-4150, ¶ 33-37. Accordingly, an appellant who fails to object to a structural error still must show that "an error occurred, that the error was obvious, and that there is 'a reasonable probability that the error resulted in prejudice,' meaning that the error affected the outcome of the trial." (Emphasis omitted.) *McAlpin* at ¶ 66, quoting *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.

{¶11} "[T]he decision to prosecute is discretionary." *State v. Smith*, 9th Dist. Lorain No. 95CA006235, 1996 WL 351152, * 2 (June 26, 1996). Nevertheless, it may not be based "on vindictiveness so as to 'punish a person because he has done what the law plainly allows him to do * * *.'" *Id.*, quoting *State v. Wilson*, 47 Ohio App.3d 136, 137 (8th Dist.1988). Prosecutorial vindictiveness may be presumed in certain instances. *See State v. Viscomi*, 9th Dist. Medina No. 2400-M, 1995 WL 553187, *6 (Sept. 20, 1995) (retaliation presumed if a defendant receives a harsher sentence on retrial after successfully challenging his conviction). In the pretrial setting, however, "such a presumption will not be invoked." *Id.* "The myriad of possible motives present in the pretrial setting * * * makes it unrealistic to apply the presumption of vindictiveness[.]" (Alterations sic.) *Id.* at *7, quoting *Wilson* at 139-140. When an indictment is amended before trial, "a defendant must objectively prove that the actions of the prosecutor were retaliatory." *Viscomi* at *6.

{¶12} The State supplemented Mr. Kirkland's indictment before trial, so he is not entitled to a presumption of prosecutorial vindictiveness. *See id.*; *United States v. Goodwin*, 457 U.S. 368, 382-384 (1982). According to Mr. Kirkland, vindictiveness is evident on the face of the record because he was only charged with capital murder after he asserted his speedy trial rights. He

argues that the prosecutor was not prepared to go to trial, resented being pressured in that regard, and wanted the matter to be continued. Mr. Kirkland claims that adding a capital specification was "the one way the prosecutor could practically force the proceedings to be extended further out * * *."

{¶13} This Court rejects Mr. Kirkland's argument for three reasons. First, the record reflects that Mr. Kirkland agreed to a limited waiver of his speedy trial time before the State issued his supplemental indictment. By the time the supplemental indictment issued in January 2017, Mr. Kirkland had already agreed to waive time until at least May 2017. The fact that the capital murder charge was added after Mr. Kirkland had already agreed to a lengthy continuance detracts from his claim that the prosecutor added the charge in response to Mr. Kirkland's decision to invoke his speedy trial rights.

{¶14} Second, and relatedly, Mr. Kirkland appears to be arguing that the primary reason the prosecutor added a capital murder charge was to give the State additional time to prepare for trial. Prosecutorial vindictiveness requires a prosecutor's charging decision to have been "motivated by a desire *to punish* [a defendant] for doing something that the law plainly allowed him to do." (Emphasis added.) *Goodwin* at 384. If the prosecutor's motivation in adding a capital murder charge was something other than a desire to punish Mr. Kirkland, then Mr. Kirkland cannot be said to be a victim of prosecutorial vindictiveness.

{¶15} Finally, this Court rejects Mr. Kirkland's argument because he has not shown that there exists a reasonable probability that the prosecutor's actions prejudiced to him. *See Barnes*, 94 Ohio St.3d at 27; *McAlpin*, 2022-Ohio-1567, at ¶ 66, quoting *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, at ¶ 22. Had Mr. Kirkland gone to trial strictly on an aggravated murder charge, he still would have been subject to life in prison without the possibility of parole. *See* R.C.

2929.02(A); R.C. 2929.03(A)(1)(a).  His argument that a jury in a non-capital setting would have been less inclined to believe the State's witnesses is specious, at best, as is his argument that he might have received a lesser sentence if the death penalty was not an option.  It is well-settled that "speculation cannot prove prejudice."  *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 54.  Because Mr. Kirkland has not shown that he sustained prejudice as a result of the prosecutor's actions, he has not met his burden of establishing plain or structural error.  *See Barnes* at 27; *McAlpin* at ¶ 66, quoting *Rogers* at ¶ 22.  Mr. Kirkland's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY ADOPTING A JURY VERDICT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶16}  In his second assignment of error, Mr. Kirkland argues his convictions are against the manifest weight of the evidence.  Specifically, he argues the jury lost its way when it found the testimony of the State's witnesses credible and chose to believe he was the individual who shot J.H.  We disagree.

{¶17}  When considering whether a conviction is against the manifest weight of the evidence, this Court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).  A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction.  *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶18}  Mr. Kirkland argues the jury lost its way when it found he was the individual who shot J.H.  According to Mr. Kirkland, the only evidence the State presented to that effect was the

testimony of Codefendant One and Codefendant Two. He claims their testimony was not credible because it differed from their initial statements to police and only changed when they secured favorable plea agreements. Further, he notes that the police never performed any gunshot residue tests to determine whether he, Codefendant One, or Codefendant Two fired a gun. Because he should not have been convicted based on the testimony of "two shaky witnesses without corroborating physical or scientific evidence," Mr. Kirkland argues, his convictions are against the manifest weight of the evidence.

{¶19} Officer Shawn Petty testified that he responded to J.H.'s apartment around 11:00 a.m. on August 29, 2016, after a female called 911 to report a possible homicide. Codefendant One and L.T. were waiting outside when he arrived and were standing next to a Jeep Liberty. When Officer Petty spoke to Codefendant One, she said she had come to J.H.'s apartment to braid his hair, found his door unlocked, and let herself in. Codefendant One told the officer that she found J.H.'s body and checked his pulse before screaming for L.T. L.T. then came inside, told her not to touch anything, and said they should call the police. Officer Petty testified that, during his encounter with Codefendant One, he glanced at the backseat of the Jeep Liberty she and L.T. had brought to the scene and saw several odd items, including what looked to be an unboxed TV and men's apparel. When Codefendant One was originally asked about those items, she told detectives she was returning them to J.H. because he had left them at her residence. As detailed below, her answer to that question and her explanation for her presence at the scene changed significantly by the time she testified at trial.

{¶20} Codefendant One testified that she had known J.H. for a few years and considered him her "sugar daddy." She explained how he would pay her rent, take her out, and give her money in exchange for her having sex with him and bringing him clients. Although J.H. had a job

as a tester for various gaming systems, Codefendant One testified that he also earned large sums of money selling Percocet. She helped facilitate those sales by introducing him to people who wished to buy pills. As a result of J.H.'s drug dealing, Codefendant One knew he always had a large stack of cash that he kept in a Crown Royal bag. She also knew his apartment was filled with gaming systems, smart TVs, and other electronic equipment.

{¶21} At the time of J.H.'s murder, Codefendant One was living in her aunt's basement and her female friend, L.T., was staying with her. She testified that she and L.T. had their own sexual partners but sometimes had sex with one another or as part of a group. Codefendant One knew of Mr. Kirkland because he and L.T. had dated sporadically over the years. Yet, she did not meet Mr. Kirkland in person until a few days before J.H.'s murder.

{¶22} Codefendant One confirmed that Mr. Kirkland was a drug dealer. On the day she met him in person, she used her cousin's Jeep Liberty to drive him and L.T. to the south side of Lorain because Mr. Kirkland had arranged to purchase a gun from a man who lived there. According to Codefendant One, Mr. Kirkland had no intention of paying for the gun. He remained seated in their vehicle and, when the seller handed him the gun to inspect it, Codefendant One sped away and "pretty much laughed" at the theft they had committed. She then drove them to a sporting goods store so Mr. Kirkland could purchase bullets for the gun. The State played a security recording from the store for Codefendant One, and she confirmed that it showed Mr. Kirkland purchasing bullets while she and L.T. stood nearby.

{¶23} Codefendant One testified that she saw Mr. Kirkland again a few days later, on August 27th, when she and L.T. went for a drive with him. Mr. Kirkland picked up the women in a car that belonged to his girlfriend. At some point during the ride, Mr. Kirkland handed Codefendant One his gun. She testified that she pointed the gun out the window on a deserted

road, held it sideways, and fired it. According to Codefendant One, Mr. Kirkland then took back the gun and expressed his annoyance at her having "shot it wrong."

{¶24} The following day, August 28th, Codefendant One threw a birthday party for her daughter. She testified that the girls went to a family member's house for a few hours in the afternoon and she spent that time with L.T. and Mr. Kirkland. The three of them drove to J.H.'s apartment, and Codefendant One briefly met with him to obtain Percocet. During their exchange, she saw J.H.'s "wad of money" and soon told Mr. Kirkland J.H. "had a lot of money in a Crown Royal bag * * *." When asked why she had shared that information, Codefendant One testified that Mr. Kirkland had expressed an interest in robbing someone, so she suggested J.H. She said she picked J.H. because he had a lot of money, he was usually alone, and she knew he was unlikely to report the theft of drug proceeds to the police.

{¶25} Codefendant One returned to her aunt's house with L.T. after their outing with Mr. Kirkland so she could finish hosting her daughter's birthday party. She testified that, once she put her children to bed later that same evening, she and L.T. went out. The two women began taking Xanax and ingesting cocaine while L.T. tried contacting Mr. Kirkland. L.T. eventually succeeded in reaching him, and she and Codefendant One picked up Mr. Kirkland in L.T.'s mother's car. Mr. Kirkland then started driving the car and took the women to pick up Codefendant Two. Codefendant One testified that she did not know Codefendant Two and had "no clue" why Mr. Kirkland wanted him there.

{¶26} Once Codefendant Two joined them, the group went to Walmart, and Codefendant Two stole a gun holster for Mr. Kirkland. Though she never saw Mr. Kirkland show Codefendant Two a gun, Codefendant One heard Mr. Kirkland tell Codefendant Two what size holster he would need before Codefendant Two went into Walmart. As part of its case-in-chief, the State introduced

surveillance footage from that Walmart. The footage showed Codefendant Two entering the store that evening. There was testimony that the police were able to use that footage to track Codefendant Two's movements inside the store and locate the packaging he removed from the gun holster and discarded before leaving with the holster.

{¶27} Codefendant One testified that the group next stopped at a 7-Eleven gas station where Mr. Kirkland and Codefendant Two went inside and the latter returned with a case of Bud Ice beer. From there, Mr. Kirkland drove the group to J.H.'s apartment and parked the car in an alley behind the building. Codefendant One testified that J.H. lived on the second floor of the building and an inside stairwell led to his front door. When they arrived, she went inside alone, met with J.H., and got more Percocet. She testified that she left his apartment door unlocked on her way out. When she returned to the car, she told Mr. Kirkland that J.H. was home and his door was unlocked.

{¶28} Codefendant One testified that she and L.T. remained inside the car while Mr. Kirkland and Codefendant Two got out. She acknowledged that she could not see J.H.'s apartment door from the car, so she never actually saw the two men go inside. As she and L.T. waited in the car, however, they eventually heard what sounded like gunshots. Mr. Kirkland then returned to the car without Codefendant Two, and the three of them left. Codefendant One testified that Mr. Kirkland was holding J.H.'s Crown Royal bag when he entered the car. Once they returned to her residence, Codefendant One testified, Mr. Kirkland opened the bag and gave her and L.T. each $1,000 in cash.

{¶29} Codefendant One testified that L.T. left for a while after Mr. Kirkland gave them the cash, but she did not know where L.T. went. She testified that she was "really high" at that point and told Mr. Kirkland to have sex with her. As they were having sex, Codefendant One

stated, Mr. Kirkland pulled her head back and said "he killed [her] sugar daddy." She testified that she blacked out shortly thereafter and only remembered snippets of the next few hours. At one point, Codefendant One testified, she recalled going to a different Walmart with L.T. and Mr. Kirkland and purchasing a doll for her child. She could not remember, however, how she paid for the doll or how she got home from the store. The State introduced surveillance footage from that Walmart, and Codefendant One confirmed that it showed her, L.T., and Mr. Kirkland shopping there at 4:40 a.m. on August 29th.

{¶30} Codefendant One testified that she woke up in her bed hours later. Mr. Kirkland was gone, along with all the cash from the Crown Royal bag, and L.T. was sitting on her bed. Codefendant One stated that she began crying upon awakening and asking L.T. whether Mr. Kirkland had really killed J.H. Although L.T. was reluctant, Codefendant One testified, she eventually agreed to accompany Codefendant One to J.H.'s apartment to see if he was alive. Codefendant One borrowed her cousin's Jeep Liberty to drive them there.

{¶31} Codefendant One testified that J.H.'s apartment door was open when they arrived, and she and L.T. found J.H.'s body on his bedroom floor. According to Codefendant One, she panicked when she saw J.H.'s body and grabbed one of his gaming systems. L.T. also grabbed a few items, and the two returned to the car. Codefendant One testified that she called 911 shortly thereafter and met the police at the apartment. She admitted that she initially lied to the police about why she was there and why J.H.'s items were in the backseat of the Jeep Liberty because she was afraid and did not want to get into trouble.

{¶32} On both direct and cross examination, Codefendant One testified extensively as to the particulars of her plea agreement with the State. She admitted she was originally charged with felony murder and facing a life sentence. In exchange for her testimony, Codefendant One

acknowledged, the State had agreed to seek the dismissal of her murder charge and to recommend a shorter sentence. She conceded she had not yet been sentenced and that her plea agreement was contingent upon her testifying truthfully. While admitting she would receive a benefit from her plea, Codefendant One expressed her dissatisfaction with her agreement because it would still result in a significant sentence. She testified that she decided to cooperate because she wanted to take responsibility for her actions and have a chance to be with her children again in the future.

**{¶33}** Codefendant Two testified that he met Mr. Kirkland one to two months before this incident, was somewhat familiar with L.T., and had never met Codefendant One. He knew Mr. Kirkland because he would purchase crack cocaine from Mr. Kirkland. To help fund his $500 a day drug habit, Codefendant Two testified, he routinely stole items from stores and sold them.

**{¶34}** Codefendant Two testified that Mr. Kirkland took him to a sporting goods store early in the afternoon on August 28, 2016, because Mr. Kirkland wanted him to steal a laser sight for a gun. Once they walked inside the store, Mr. Kirkland showed him where the laser sight was located and walked away, leaving Codefendant Two to procure the item. He confirmed that he removed the laser sight from its packaging, put it in his pocket, and walked out of the store. He then gave it to Mr. Kirkland, and Mr. Kirkland attempted to fit it on his gun. Codefendant Two described the gun and said it was a 9mm. He testified that Mr. Kirkland was unable to use the stolen laser sight because it did not fit his gun. When shown a still image taken from security footage inside the sporting goods store, Codefendant Two confirmed that it showed him and Mr. Kirkland inside the store at 1:16 p.m. on August 28th.

**{¶35}** Codefendant Two testified that he and Mr. Kirkland parted ways after leaving the sporting goods store but exchanged text messages later that day. Mr. Kirkland was interested in settling a debt he owed Codefendant Two and eventually messaged Codefendant Two that he

"need[ed] a lick foreal." Codefendant Two understood the message to mean Mr. Kirkland needed to steal something so he had money. Mr. Kirkland also messaged Codefendant Two that he wanted them to go to Walmart because he needed a holster for his gun.

{¶36} Just before midnight, Mr. Kirkland picked up Codefendant Two in a car with L.T. and Codefendant One. Codefendant Two testified that Mr. Kirkland drove them to a building, later identified as J.H.'s apartment building, and Codefendant One went inside for a short while. When she returned, the group went to Walmart, and Codefendant Two stole a gun holster for Mr. Kirkland. The State played surveillance footage from the Walmart for Codefendant Two. He confirmed that it showed him entering the store around 12:40 a.m. and their group leaving the parking lot about ten minutes later.

{¶37} According to Codefendant Two, he thought Mr. Kirkland brought him along that evening to facilitate the theft from Walmart. As their evening progressed, however, Mr. Kirkland informed Codefendant Two that Codefendant One was about to tell him "what's really about to happen * * *." Codefendant One then said "they were trying to hit a lick on some guy that had some [Percocet] and a whole bunch of money." Codefendant Two testified that he was uncomfortable with their plan to rob the man with the Percocet because he did not want to be part of a home invasion. Even so, he testified, he went along with the plan because he did not feel he had a choice. When asked why he did not just walk away from Mr. Kirkland, Codefendant Two stated: "It's not that easy when you don't have a gun."

{¶38} Codefendant Two testified that, after they left Walmart, the group went to a 7-Eleven where he stole a twelve-pack of Bud Ice beer. Mr. Kirkland then drove them back to J.H.'s apartment building and parked in an "alleyway type driveway * * *." According to Codefendant Two, he and Mr. Kirkland entered J.H.'s apartment together. He stated that he was holding a taser,

which he always carried as a safety measure, and Mr. Kirkland was holding a gun. It was his testimony that they found J.H. asleep in his bedroom, J.H. struggled when they tried to restrain him, and Mr. Kirkland repeatedly shot him. After Mr. Kirkland did so, he grabbed a Crown Royal bag off the floor and ran out of the apartment.

{¶39} Codefendant Two estimated that he remained rooted to the spot in J.H.'s apartment for almost twenty minutes after the shooting, shocked by what had happened. He then quickly began gathering items from the apartment to steal. When he eventually located J.H.'s car keys, he filled the car with items from the apartment so he could drive them elsewhere to sell them. The police later found J.H.'s car abandoned in a field.

{¶40} Codefendant Two testified that he worked the remainder of that day at his job as a bricklayer and, at some point, Mr. Kirkland called to tell him he had the money he owed him. After Codefendant Two left work, the police found him and brought him to the station for an interview. Codefendant Two acknowledged that he lied to the police during the interview. He initially denied having anything to do with the shooting and later said he was present at J.H.'s apartment but stayed outside. Codefendant Two testified that he initially lied to the police because he was afraid of the potential repercussions for his family if he cooperated.

{¶41} Much like Codefendant One, Codefendant Two testified extensively about the particulars of his plea agreement with the State on direct and cross examination. He admitted he was originally charged with several counts of murder, including aggravated murder, and facing a life sentence. In exchange for his testimony, the State agreed to seek the dismissal of his murder charges and recommend a shorter sentence. Codefendant Two conceded he had not yet been sentenced and his plea agreement was contingent upon his testifying against Mr. Kirkland. While

he acknowledged his plea agreement was beneficial to him, he also testified he would never be safe from that point forward because "[n]obody likes cooperators."

{¶42} An autopsy revealed that J.H. died as a result of three gunshot wounds. The police collected spent casings from his bedroom, and a ballistics expert examined those casings and the bullets removed from J.H.'s body. Although the expert had no gun to test in order to link the bullets and the casings to one another, he was able to compare the individual bullets with each other and the individual casings with each other. Based on that analysis, he testified that all the bullets had been fired from the same gun and all the casings had been fired from the same gun. He also testified that all the bullets and casings were 9mm Luger brand ammunition.

{¶43} V.L. testified that she and Mr. Kirkland had been dating for about six to eight months before this incident occurred. The two exchanged text messages on the evening of August 28, 2016, just a few hours before J.H. was shot. V.L. indicated that she and Mr. Kirkland were having money problems at the time and did not have enough money to pay her rent, fix her car, or purchase a different used car. About thirty minutes before midnight, Mr. Kirkland messaged: "[V.L.] you gone make me kill somebody." The two continued to sporadically exchange messages over the next few hours and, just after 2:00 a.m., Mr. Kirkland messaged that he was on his way to V.L.'s house "with the bands." V.L. explained that Mr. Kirkland's message meant he had money. Mr. Kirkland also sent messages wanting to know how much money she wanted for her car and promising they would have enough money to purchase a new used car.

{¶44} V.L. testified that Mr. Kirkland never came to her house after text messaging her but brought her coffee at work that morning (i.e., the morning of August 29th). That same afternoon, Mr. Kirkland sent V.L. a text message asking her to call him immediately. He then sent another message about ten minutes later, indicating he "might need an alibi." Mr. Kirkland asked

V.L. to say he was with her the entire evening and did not have a certain phone number. He told V.L. that, if asked, he would say his phone had been stolen. V.L. testified that the police called her later that afternoon and she initially lied to them on Mr. Kirkland's behalf because she did not know why they wanted to speak with him.

{¶45} W.J. testified that he knew Mr. Kirkland and spent time with him on August 29th. He indicated that Mr. Kirkland's girlfriend wanted coffee at work, so he went with Mr. Kirkland to get the coffee and run a few other errands before returning home. W.J. was napping later that afternoon when he began receiving calls and messages from Mr. Kirkland. When he finally spoke with Mr. Kirkland, Mr. Kirkland said he needed to get to Cleveland immediately and was looking for a ride. W.J. offered to take Mr. Kirkland as far as North Olmstead, and Mr. Kirkland accepted his offer. W.J. indicated that Mr. Kirkland was trying to rush him and begged him to "please hurry." He confirmed that he ultimately left Mr. Kirkland at a bus station near North Olmstead or its surrounding area.

{¶46} Detective Buddy Sivert acted as the lead investigator in this matter. He testified that the police believed J.H. was murdered around 1:30 a.m. on August 29th because a neighbor thought he heard gunshots and spotted a single black male fleeing the scene at that time. Detective Sivert spoke with Codefendant One and L.T. and, when he interviewed Codefendant One, he learned Mr. Kirkland had been involved in the shooting. The detective testified Mr. Kirkland was arrested much later that evening, and he interviewed Mr. Kirkland around midnight. At the time of his arrest, Mr. Kirkland was carrying a bus pass. A search of his cell phone records uncovered the text messages he exchanged with V.L. and W.J. as well as additional messages he sent to an unknown person, offering more than $6,000 for the use of their car. Detective Sivert testified an

analysis of Mr. Kirkland's phone also revealed internet searches for RTA schedules, maps of the Greater Dayton RTA, and vacation rentals.

**{¶47}** Detective Sivert summarized the surveillance footage the police obtained from various locations after speaking with Codefendant One and Codefendant Two. Footage from a sporting goods store showed Mr. Kirkland purchasing 9mm Lugar ammunition with Codefendant One on August 25th and returning to the store with Codefendant Two three days later for the laser sight Codefendant Two stole. Footage from Walmart later that same evening showed Codefendant Two stealing a gun holster, which the police found when they searched Codefendant One's residence. Finally, footage from 7-Eleven showed Mr. Kirkland and Codefendant Two entering the gas station after leaving Walmart. Detective Sivert testified that, during his interview, Mr. Kirkland expressly denied having gone to 7-Eleven that evening.

**{¶48}** Apart from the foregoing footage, Detective Sivert testified that the police were able to recover surveillance footage and receipts from a second Walmart (i.e., the Walmart that Codefendant One vaguely recalled frequenting with Mr. Kirkland and L.T. after the shooting). The detective confirmed that Mr. Kirkland, Codefendant One, and L.T. appeared on the recording at 4:40 a.m. on August 29th and their receipts showed Mr. Kirkland and Codefendant One used $100 bills to pay for their respective purchases. The detective testified that Mr. Kirkland's purchase included a laser sight for a gun. The State relied on that purchase as evidence that Mr. Kirkland still had possession of the gun he used to kill J.H. several hours earlier.

**{¶49}** Regarding gunshot residue testing, Detective Sivert confirmed that no samples were taken from Mr. Kirkland, L.T., Codefendant One, or Codefendant Two. He explained that significant time passed between J.H.'s murder and the arrests of Codefendant Two and Mr. Kirkland. Moreover, during those hours, Codefendant Two was engaged in manual labor

performing his job as a bricklayer. Given those factors, the detective explained, the police felt it was unlikely any gunshot residue tests would be productive. Likewise, Detective Sivert testified, the police decided not to take samples from Codefendant One and L.T. because both women admitted they went inside J.H.'s bedroom after the shooting. The detective explained that any gunshot residue found on the women easily could have been attributed to their having touched J.H.'s body or items in his bedroom. For the foregoing reasons, the police chose not to conduct any gunshot residue testing.

{¶50} Having reviewed the record, this Court cannot conclude that the jury lost its way and created a manifest miscarriage of justice when it chose to believe Mr. Kirkland was the individual who shot J.H. *See Otten*, 33 Ohio App.3d at 340. The jury heard testimony that Mr. Kirkland stole a gun, purchased bullets for the gun, tried to procure a laser sight for the gun, and had Codefendant Two steal a holster for the gun. The jury learned that J.H. was shot repeatedly with 9mm Lugar rounds, the same type and brand of ammunition that Mr. Kirkland had purchased for his gun a few days earlier. The jury also heard testimony that Mr. Kirkland and his girlfriend needed money, that he discovered J.H. had a sizeable amount of cash, that he formulated a plan to rob him, and, following the robbery, that he told his girlfriend he had gotten money, purchased items using a $100 bill, and offered someone a significant amount of money in exchange for their car. Further, the jury heard testimony that Mr. Kirkland asked his girlfriend for an alibi and attempted to flee the area following law enforcement's discovery of his involvement in the murder. *See State v. Nichols*, 9th Dist. Summit No. 24900, 2010-Ohio-5737, ¶ 11, quoting *State v. Taylor*, 78 Ohio St.3d 15, 27 (1997) ("It is an established principle of law that '[f]light from justice * * * may be indicative of a consciousness of guilt.'"). Although Codefendant One and Codefendant Two both reaped personal benefits from testifying against Mr. Kirkland, the jury was made aware

of the details of their plea agreements. As the trier of fact, the jury was in the best position to evaluate their credibility and resolve any conflicts in that regard. *See State v. Bullard*, 9th Dist. Wayne No. 20AP0032, 2021-Ohio-4044, ¶ 14. Upon review, Mr. Kirkland has not shown that this is the exceptional case in which the evidence weighs heavily against his convictions. *See Otten* at 340. As such, we cannot conclude that his convictions are against the manifest weight of the evidence. Mr. Kirkland's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY IMPOSING A LIFE SENTENCE WITHOUT PAROLE AS RECOMMENDED BY THE JURY BECAUSE OHIO REVISED CODE SECTION 2929.03(D)(2)(c) IS UNCONSTITUTIONAL.

**{¶51}** In his third assignment of error, Mr. Kirkland argues that the trial court erred when it sentenced him to life in prison without the possibility of parole under R.C. 2929.03(D)(2)(c). He argues that statutory provision is unconstitutional because it violates the Equal Protection Clause. For the following reasons, this Court rejects his argument.

**{¶52}** "The failure to challenge the constitutionality of a statute in the trial court forfeits all but plain error on appeal, and the burden of demonstrating plain error is on the party asserting it." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 2. As previously noted, the plain error doctrine requires there to be: (1) a deviation from a legal rule; (2) that is an obvious defect in the trial; and (3) that affects the appellant's substantial rights. *Barnes*, 94 Ohio St.3d at 27. "There is a discretionary aspect of Crim.R. 52(B), and reviewing courts should take notice of plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Franklin*, 9th Dist. Summit No. 29071, 2019-Ohio-1513, ¶ 32, quoting *Long*, 53 Ohio St.2d 91 at paragraph three of the syllabus. Moreover, this Court will not develop a plain error argument on an appellant's behalf. *Franklin* at ¶ 34-36.

{¶53} Mr. Kirkland argues R.C. 2929.03(D)(2)(c) violates the Equal Protection Clause because it requires trial courts to impose the exact sentence recommended by a jury upon offenders convicted of aggravated murder when the jury has not recommended death. In those instances, the trial court lacks the discretion to impose a different sentence. *See* R.C. 2929.03(D)(2)(c). Conversely, when the jury has recommended the death penalty, R.C. 2929.03(D)(3) gives trial courts the discretion to choose from several less severe sentencing options if it conducts its independent review and determines the death penalty is not warranted. Mr. Kirkland claims R.C. 2929.03(D)(2)(c) is unconstitutional because there is no rational basis for treating subsets of aggravated murder offenders differently and limiting a trial court's sentencing discretion in the context of offenders who have not received a death penalty recommendation.

{¶54} Mr. Kirkland acknowledges that he did not challenge the constitutionality of R.C. 2929.03(D)(2)(c) in the lower court. He asks this Court to review his argument for plain error. Yet, he fails to articulate an argument to demonstrate plain error. *See id.* at ¶ 36. His brief includes a single sentence wherein he writes: "Because this issue was not raised in the trial court, [Mr.] Kirkland asserts plain error pursuant to the same authority cited earlier in his brief." He has not individually addressed any of the plain error factors to develop an argument in that regard. This Court will not create a plain error argument on Mr. Kirkland's behalf. *See id.* at ¶ 34-36. *Accord State v. Boatright*, 9th Dist. Summit No. 28101, 2017-Ohio-5794, ¶ 8; *In re R.P.*, 9th Dist. Summit No. 28097, 2017-Ohio-276, ¶ 7; *M.H. v. J.P.*, 9th Dist. Lorain Nos. 15CA010832, 15CA010833, 2017-Ohio-33, ¶ 8-10. Because Mr. Kirkland has not developed a plain error argument, his third assignment of error is overruled on that basis.

III.

**{¶55}** Mr. Kirkland's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETTY SUTTON
FOR THE COURT

TEODOSIO, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

STEPHEN P. HANUDEL, Attorney at Law, for Appellant.

J.D. TOMLINSON, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.