[Cite as *State v. Ross*, 2023-Ohio-1185.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellee

    v.

JOCQUEZ ROSS

    Appellant

C.A. No.     21CA011729

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    17CR095533

DECISION AND JOURNAL ENTRY

Dated: April 10, 2023

HENSAL, Judge.

{¶1}    Appellant/Cross-Appellee, Jocquez Ross, appeals from the judgment of the Lorain County Court of Common Pleas. Additionally, Appellee/Cross-Appellant, the State of Ohio, appeals the sentence the trial court imposed upon Mr. Ross. This Court affirms in part and reverses in part.

I.

{¶2}    One evening around 10:00 p.m., a shooting occurred in the parking lot of an apartment complex in Elyria. The victims, M.L. and F.T., were a married couple involved in drug dealing. They were shot while seated in the driver's seat and front passenger's seat of their car. A man who lived in the apartment complex ("the 911 caller") heard the shooting and saw a black male emerge from the backseat of M.L. and F.T.'s car before running away. The 911 caller watched the fleeing male disappear behind a building just before a black Ford Escape exited the

parking area behind that same building and left the scene. Once the 911 caller realized two people had been shot, he called the police.

{¶3} Investigators obtained phone records for the victims and identified two phone numbers of interest. One of those phone numbers eventually led the police to Mr. Ross, who knew M.L. and had business dealings with him. Mr. Ross admitted he spoke with M.L. on the phone several times the day of his murder. He claimed he was at his girlfriend's residence when the murders occurred, but his cell phone records proved otherwise. The police also were able to link him to a second, prepaid phone that was activated within an hour of the murders, used to call M.L., and discarded in a wooded area about one-half mile from the scene. Additionally, the police learned Mr. Ross frequently borrowed a black Ford Escape from a man to whom he sold drugs. The last time he returned the car to the man, he instructed the man to report it stolen.

{¶4} A grand jury indicted Mr. Ross on fourteen counts. With respect to M.L., Mr. Ross was charged with aggravated murder, murder, felony murder, and two counts of felonious assault, charged in the alternative. With respect to F.T., Mr. Ross likewise was charged with aggravated murder, murder, felony murder, and two counts of felonious assault, charged in the alternative. Mr. Ross also was charged with three counts of tampering with evidence and one count of having a weapon under disability. Both aggravated murder counts carried capital specifications, and each murder count and felonious assault count carried firearm specifications and repeat violent offender specifications. Additionally, one of the tampering counts and the count for having a weapon under disability carried a firearm specification.

{¶5} Mr. Ross chose to try his counts and specifications to a jury, save for his repeat violent offender specifications and his count for having a weapon under disability. The trial court agreed to hear those charges at the conclusion of his trial. The trial began in March 2020, but the

global pandemic caused the trial court to order a continuance during the State's case-in-chief. The trial did not resume until August 2020. At its conclusion, the jury found Mr. Ross not guilty of F.T.'s aggravated murder and one count of tampering. The jury found him guilty of each of the remaining counts and specifications they were asked to try. The trial court then found Mr. Ross guilty of having a weapon under disability and being a repeat violent offender.

{¶6} The trial court sentenced Mr. Ross to life in prison with parole eligibility after 43 years. Relevant to this appeal, the court sentenced him on one of his firearm specifications and merged the others as allied offenses of similar import. Mr. Ross has appealed his judgment of conviction, and the State has cross-appealed to challenge the trial court's sentencing decision. Collectively, Mr. Ross and the State raise nine assignments of error for this Court's review. For ease of analysis, we rearrange several of the assignments of error.

II.

MR. ROSS'S ASSIGNMENT OF ERROR VII

THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND OF THE OHIO CONSTITUTION.

{¶7} In his seventh assignment of error, Mr. Ross argues his convictions are against the manifest weight of the evidence. This Court disagrees.

{¶8} When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "A reversal on this basis is reserved for the exceptional case in which the evidence

weighs heavily against the conviction." *State v. Croghan*, 9th Dist. Summit No. 29290, 2019-Ohio-3970, ¶ 26. This Court "will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Warren*, 9th Dist. Summit No. 29455, 2020-Ohio-6990, ¶ 25, quoting *State v. Tolliver*, 9th Dist. Lorain No. 16CA010986, 2017-Ohio-4214, ¶ 15.

{¶9} Mr. Ross argues the jury lost its way when it chose to believe he was the one who shot M.L. and F.T. or was complicit in their murders. According to Mr. Ross, the 911 caller who reported the shooting lacked credibility and "other drug dealers [who] were feuding with M.L." were more likely culprits. He notes the trial included significant testimony about M.L.'s involvement in the drug trade and rumors he was working with law enforcement shortly before his death. Because the evidence does not support the jury's verdict, Mr. Ross argues, his convictions must be reversed.

{¶10} Initially, we note Mr. Ross's argument includes the statement: "there is insufficient evidence that [Mr.] Ross was the one who did it." Sufficiency tests the State's burden of production, not its burden of persuasion. *State v. Soucek*, 9th Dist. Lorain No. 17CA011226, 2018-Ohio-3834, ¶ 4. "[A] review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations." *State v. Walter*, 9th Dist. Wayne No. 20AP0020, 2022-Ohio-1982, ¶ 17, quoting *State v. Vicente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 18. Apart from offering a conclusory statement about the sufficiency of the evidence, Mr. Ross has not developed an argument in that regard. This Court will not construct a sufficiency argument on his behalf. *See State v. Robinson*, 9th Dist. Wayne No. 18AP0045, 2019-Ohio-3613, ¶ 7. Accordingly, we limit our review to Mr. Ross's argument that his convictions are against the manifest weight of the evidence.

{¶11}  The 911 caller testified he was watching television in his apartment around 10:00 p.m. when he heard several gunshots.  He walked to the glass sliding door at the back of his apartment, looked out at the parking lot, and saw a man emerging from the backseat of a parked car.  He gave an approximate height and weight for the man and described him as a black male wearing dark clothing.  He observed the man had "something sticking up a little" from his head, like a hat or bushy hair, and green underwear beneath loose pants that were falling down.  As he watched, the man ran at an angle between two nearby condominium buildings before disappearing from view.  The 911 caller then saw a black Ford Escape pull out of a parking area behind those condominiums and drive away.  He walked outside a few minutes later and called 911 once he realized two people had been shot inside the parked car he had seen from his apartment.

{¶12}  After police identified the victims as M.L. and F.T., they secured their cell phone records and looked for calls they made or received near the time of their murders.  Retired Detective Daniel Sumpter testified the police flagged two cell phone numbers of interest.  Both numbers repeatedly appeared in M.L.'s call history shortly before his death.  Because each number was linked to a prepaid phone, the police were initially unable to identify the owner of either phone.  Detective Sumpter explained how his department ultimately enlisted the help of federal agents to track the physical location of each phone using GPS technology and live signals sent to the phones by providers during the search.  The police were able to track one phone to a wooded area about one-half mile from the murder scene.  Detective Sumpter termed that phone "the burner phone" at trial. The police were never able to recover the burner phone because it died before they completed their search and further recovery efforts failed.  Even so, Detective Sumpter testified, the police succeeded in tracking the second phone to the residence of Mr. Ross's girlfriend and connecting it to Mr. Ross.

{¶13} Retired Sergeant Donald Moss testified the burner phone was activated around 9:00 p.m. the night of the murders and was used to make six outgoing calls. Five of those calls were outgoing calls to M.L.'s cell phone. The police traced the sixth call to a landline that was disconnected in 2015. Evidence showed that landline belonged to Mr. Ross's grandmother from 1986 until 2015. Evidence also showed Mr. Ross's cell phone made a one-second call to the burner phone at 9:15 p.m.—fifteen minutes after the burner phone was first activated and seven minutes before it made its first outgoing call at 9:22 p.m. Due to the brevity of the 9:15 p.m. call, it did not connect, and thus, did not appear on the call records for the burner phone. Detective Moss testified the call only appeared on the call records for Mr. Ross's cell phone. According to the detective, the 9:15 p.m. call was consistent with a call placed for the sole purpose of storing a number in one's phone. While the call should have appeared in Mr. Ross's call log when the police physically searched his phone, Sergeant Robert Whiting testified that was not the case. When the police confiscated Mr. Ross's cell phone and searched his call log, they discovered someone had manually deleted the 9:15 p.m. call to the burner phone from his call log. The State also set forth evidence that, two days after the murders, Mr. Ross changed his cell phone number while keeping his device.

{¶14} Sergeant Moss testified M.L. and F.T. were drug dealers and, around the time of their murders, M.L. was rumored to have been working with the police. Indeed, there was a particular rumor M.L. had provided the police with information that led to the arrest and conviction of one of Mr. Ross's cousins. F.T.'s mother confirmed the existence of that rumor. She testified Mr. Ross was a drug dealer and, a few weeks before the murders, he and another of his cousins came to her house to sell drugs to her ex-husband. While there, the cousin became upset and began asking her whether M.L. was a snitch. The mother testified Mr. Ross was present during that

exchange. She also testified M.L. and F.T. had a fight about Mr. Ross and his cousin a week later. The mother heard F.T. screaming at M.L. and calling him stupid because he had fronted drugs to Mr. Ross and his cousin without receiving payment. According to the mother, F.T. told M.L. that Mr. Ross and his cousin were not his friends and were not going to pay him the money they owed because "they [were] just there calling him a snitch * * *."

{¶15} When the police first spoke with Mr. Ross at the police station, he told them he was with his girlfriend at her home before, during, and after the murders. He also told the police he had spoken to M.L. that day because they planned to meet, but the meeting never occurred because M.L. stopped answering his phone. To refute Mr. Ross's statements, the State introduced testimony from Special Agent Kevin Horan, a founding member of the FBI's Cellular Analysis Survey Team. Special Agent Horan generated cellular footprints for Mr. Ross's phone, the burner phone, and M.L.'s phone based on cell phone records and additional cell service information he acquired from cell phone providers. The data showed Mr. Ross's phone traveled to Cleveland a few hours before the murders and returned to the area around 8:30 p.m. The data also showed Mr. Ross's phone, the burner phone, and M.L.'s phone all used the same side of one cell phone tower to communicate minutes before the murder, meaning all three phones were physically located in the service area encompassed by that tower. Special Agent Horan confirmed that cell phone tower was not one that would have serviced Mr. Ross's girlfriend's home. Additionally, call records showed Mr. Ross's cell phone had numerous incoming and outgoing calls from and to his girlfriend's cell phone throughout the times he claimed to have been with her.

{¶16} Because the 911 caller had seen a black Ford Escape flee the scene immediately after the shooting, the police looked for the car as part of their investigation. Sergeant Whiting testified that, with the help of Mr. Ross's girlfriend, the police eventually were able to identify the

owner of the car. The owner testified Mr. Ross was his drug dealer and he frequently loaned his car to Mr. Ross for weeks at a time in exchange for drugs. The last time Mr. Ross returned his car, Mr. Ross told the owner to report it stolen but would not say why. The owner failed to follow Mr. Ross's instructions but nevertheless had his car repossessed shortly thereafter. Within a month of the car being repossessed, the owner testified, Mr. Ross came to his house to see if he had disposed of the car. While speaking with Mr. Ross, the owner accidentally referred to the person who had repossessed his car as an "investigator." When the owner said an "investigator" had taken the car, Mr. Ross appeared nervous, put his hands on his face, "and said, 'Oh, no.'"

{¶17} An autopsy revealed M.L. and F.T. had both been shot twice by a 9mm handgun. Their wounds were consistent with someone having shot them from the backseat of their car. According to Sergeant Moss, their murders appeared to have been planned and were not consistent with a robbery motive, as both victims died alongside their personal belongings, cell phones, and a sizeable amount of cash. The State introduced, as part of its case-in-chief, a text message Mr. Ross received from a cousin eleven days before the murders. In the message, the cousin asked Mr. Ross when he would be returning the cousin's gun. Mr. Ross responded the following day: "I been needing it. It's been a lot going on."

{¶18} At trial, the defense theorized M.L. and F.T. were murdered by individuals other than Mr. Ross due to their involvement in the drug industry. The defense repeatedly suggested two other possible shooters, a man by the initials C.C. and a man by the initials T.L.J. Both individuals had ties to M.L. and F.T. and were in the area on the night of their murders. Yet, there was testimony the police investigated both individuals and discounted them as suspects. The police learned C.C. had attended a poker game for much of the evening and were unable to establish any contact occurred between C.C. and the victims before their murders. Likewise,

T.L.J.'s cell phone records supported the conclusion he was elsewhere at the time of the murders. The foregoing evidence stood in stark contrast to the cell phone evidence linking Mr. Ross to M.L. within minutes of the murder.

{¶19} An older male relative of F.T. testified he saw M.L. and F.T. sometime between 9:25 p.m. and their murders, which occurred around 10:00 p.m. According to the male relative, he met them in a parking lot near the scene of the shooting because M.L. wanted to speak with him. He was already waiting there when M.L. and F.T. arrived in their car. He recalled having a brief conversation with M.L., during which M.L. asked him whether he would "have [M.L.'s] back" if M.L. needed him. M.L. vaguely referred to his having been "finessed out of something" by someone. It was the male relative's impression M.L. was concerned something might happen to him and wanted support if he wound up being involved in a confrontation. When the male relative did not respond enthusiastically to M.L.'s request, M.L. indicated they would just speak later and drove off with F.T. A few hours later, the male relative learned M.L. and F.T. had been killed.

{¶20} After Mr. Ross told police he was with his girlfriend at the time of the murders, he and his girlfriend were arrested on unrelated charges. While jailed on those charges, Mr. Ross made many phone calls and wrote many letters to his girlfriend. The State played portions of those calls for the jury, and Sergeant Moss read the jury portions of the letters. In his calls and letters, Mr. Ross repeatedly begged his girlfriend to stick by his side and not trust the police or her attorney. He also wrote his girlfriend that it was "very important that [she] stick to the script."

{¶21} Having reviewed the record and the arguments presented, this Court concludes Mr. Ross has not shown this is the exceptional case in which the evidence weighs heavily against his convictions. *See Croghan*, 2019-Ohio-3970, at ¶ 26. The State set forth evidence Mr. Ross had

business and personal dealings with M.L. Both were drug dealers, and there was evidence M.L. fronted Mr. Ross and his cousin drugs without payment shortly before his murder. The jury heard testimony that, less than thirty minutes before he was killed, M.L. spoke with a family member of F.T.'s about having been "finessed out of something" by someone and needing help related to that situation. There also was evidence Mr. Ross's family blamed M.L. for the arrest and conviction of one of Mr. Ross's cousins. Based on that evidence, the jury reasonably could have concluded Mr. Ross was motivated to kill M.L. and F.T. or participate in their murders due to an outstanding drug debt or the perceived affront against his family.

{¶22} The jury heard the 911 caller describe how he saw a black male emerge from the backseat of M.L. and F.T.'s car and run in the direction of a black Ford Escape that left the scene immediately thereafter. Mr. Ross challenges the 911 caller's credibility. He claims he could not have been the man the 911 caller saw running because he never had bushy hair like the 911 caller described. He also claims the 911 caller could not have seen the path of travel he described the Ford Escape taking while standing inside his apartment. Yet, the 911 caller said it might have been a hat he saw on the fleeing male's head rather than hair, and the court allowed the jury to view the scene for themselves. The jury was in the best position to judge the 911 caller's credibility based on his testimony and their view of the scene. *See State v. Shank*, 9th Dist. Medina No. 12CA0104-M, 2013-Ohio-5368, ¶ 29. Further, the State linked Mr. Ross to a black Ford Escape. The jury heard testimony he frequently borrowed that car from a client. They also heard testimony he instructed that client to report the car stolen and became upset when the client said an "investigator" had come for the car.

{¶23} The State presented significant evidence about cell phone records, call histories, and cellular footprints. Based on that evidence, the jury reasonably could have concluded Mr.

Ross repeatedly used his own cell phone to speak with M.L. the day of the murder and, directly before the murder, switched to a burner phone to communicate with him. The jury heard testimony Mr. Ross lied about his whereabouts during the murder, told his girlfriend to "stick to the script[,]" and changed his phone number two days after the murder. Based on his cellular footprint, the jury reasonably could have inferred Mr. Ross was present when the murders occurred and lied to hide his involvement. The jury heard evidence M.L. had plans to meet with Mr. Ross that evening. The jury also heard evidence Mr. Ross borrowed a gun from a cousin before the murders. Even if the jury did not believe Mr. Ross was the shooter, the jury could have found him guilty on the basis of complicity, as instructed by the trial court. Upon review, Mr. Ross has not shown the jury lost its way when it chose to believe the State's evidence and convicted him. Accordingly, this Court rejects his argument that his convictions are against the manifest weight of the evidence. His seventh assignment of error is overruled.

MR. ROSS'S ASSIGNMENT OF ERROR I

> THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING, OVER THE OBJECTION OF DEFENSE COUNSEL, HEARSAY TESTIMONY OF A WITNESS, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

{¶24} In his first assignment of error, Mr. Ross argues the trial court erred by admitting hearsay statements made by his girlfriend during the investigation and grand jury proceedings in this matter. When the girlfriend invoked her Fifth Amendment right not to testify at trial, the State successfully moved to have her statements admitted through Evidence Rule 804(B)(6). It was the State's position Mr. Ross caused his girlfriend's unavailability by repeatedly pressuring her to help him and not cooperate with the police or the State. Mr. Ross argues the forfeiture by wrongdoing exception was inapplicable because, at best, he only encouraged his girlfriend to invoke her constitutional right not to testify. According to Mr. Ross, the trial court's decision to admit his

girlfriend's out-of-court statements denied him his constitutional right to cross-examination. For the following reasons, this Court rejects his assignment of error.

{¶25} "It * * * is well-established that appellate courts should not reach constitutional issues unless 'absolutely necessary.'" *State v. Double*, 9th Dist. Medina No. 20CA0021-M, 2021-Ohio-632, ¶ 34, quoting *In re D.S.*, 152 Ohio St.3d 109, 2017-Ohio-8289, ¶ 7. It is equally well-established that non-structural constitutional error, standing alone, does not automatically require the reversal of a conviction. *See State v. Peck*, 9th Dist. Wayne No. 19AP0031, 2021-Ohio-1685, ¶ 28. For reversible error to exist, there must be both error and resulting prejudice. *State v. Austin*, 9th Dist. Summit No. 28199, 2017-Ohio-7845, ¶ 30, quoting *Princess Kim, L.L.C. v. U.S. Bank, N.A.*, 9th Dist. Summit No. 27401, 2015-Ohio-4472, ¶ 18. This Court declines to decide the merits of Mr. Ross's constitutional argument. That is because, even assuming the trial court erred by admitting his girlfriend's statements, the record reflects the error was harmless beyond a reasonable doubt. *See State v. Williams*, 6 Ohio St.3d 281 (1983), paragraphs three and six of the syllabus.

{¶26} Mr. Ross's girlfriend essentially made out-of-court statements related to four different topics. First, she told the police she could not confirm Mr. Ross's whereabouts before, during, or immediately after the murders. She indicated she was taking pain medication around that time and was sleeping a great deal. At some point the evening of the murders, she recalled Mr. Ross appearing at her residence and insisting she take him to North Olmsted. The girlfriend told the police she drove Mr. Ross to North Olmsted and dropped him off before returning home.

{¶27} Second, the girlfriend told police Mr. Ross threw an article of clothing out the car window on their drive to North Olmsted. She believed it was a pair of pants. Her statements about the pants led to Mr. Ross being charged with tampering with evidence as to the pants.

{¶28} Third, the girlfriend told police she overheard Mr. Ross speaking on the phone with someone a few weeks after the murders. Mr. Ross told the other person they needed to take a metal detector to an area near the old Walmart in Elyria to find something. Mr. Ross's statement made the girlfriend suspect he might be talking about looking for a gun in that area. Nevertheless, she admitted she only thought Mr. Ross might be talking about a gun and "never heard him say gun."

{¶29} Fourth, statements the girlfriend made to the police ultimately allowed them to track down the black Ford Escape owned by one of Mr. Ross's clients. The girlfriend recalled the general area where that client lived. Using that information, the police conducted a door-to-door search until they finally found the car's owner.

{¶30} A review of the record reveals any error in the admission of the girlfriend's out-of-court statements was harmless beyond a reasonable doubt because the remaining evidence against Mr. Ross constituted overwhelming proof of his guilt. *See Williams*, 6 Ohio St.3d 281 at paragraph six of the syllabus. The statements the girlfriend made about Mr. Ross's whereabouts merely corroborated significant evidence and testimony the State presented about Mr. Ross's cell phone records, call history, and cellular footprint before, during, and after the murders. Those records showed he was not with his girlfriend as he had claimed. They also tended to show he was present when the murders were committed and, in the hours after the murder, traveled to North Olmsted.

{¶31} Although the girlfriend's statements about Mr. Ross throwing an article of clothing from their car served as the basis for one of his tampering counts, the jury acquitted him of that count. The record, therefore, does not support the conclusion those statements contributed to his conviction. Likewise, any argument the girlfriend's statements about Mr. Ross's phone conversation contributed to his conviction is tenuous at best. The girlfriend acknowledged she

never actually heard Mr. Ross talk about a gun during that call. Moreover, the State produced other evidence Mr. Ross had access to a gun before the murders. The jury heard evidence Mr. Ross borrowed a gun from his cousin and told his cousin he still needed it just nine days before the murders occurred.

{¶32} Finally, regarding the statements the girlfriend made to help identify the owner of the black Ford Escape, the State called the owner to testify at trial. He testified Mr. Ross used to be his drug dealer, he frequently loaned his car to Mr. Ross in exchange for drugs, Mr. Ross ultimately instructed him to report his car stolen, and Mr. Ross became upset when he thought an "investigator" had taken the car. The girlfriend's statements about the owner merely aided the police in tracking him down. Because the owner testified, the State did not need to rely on the girlfriend's statements to prove Mr. Ross had access to a black Ford Escape.

{¶33} As previously outlined in this Court's analysis of Mr. Ross's manifest weight argument, the State produced a wealth of evidence against Mr. Ross. Even disregarding the girlfriend's statements, the remaining evidence "constitutes overwhelming proof of [his] guilt." *See Williams*, 6 Ohio St.3d 281 at paragraph six of the syllabus. Because the record reflects any error the trial court may have committed by admitting the girlfriend's statements was harmless beyond a reasonable doubt, this Court need not address Mr. Ross's constitutional argument. *See Austin*, 2017-Ohio-7845, at ¶ 30, quoting *Princess Kim, L.L.C.*, 2015-Ohio-4472, at ¶ 18 (reversible error requires both error and resulting prejudice). *See also Double*, 2021-Ohio-632, at ¶ 34, quoting *In re D.S.*, 152 Ohio St.3d 109, 2017-Ohio-8289, at ¶ 7 (appellate courts should refrain from deciding constitutional issues if case may be resolved on other grounds). His first assignment of error is overruled.

MR. ROSS'S ASSIGNMENT OF ERROR IV

MR. ROSS'S CONSTITUTIONAL RIGHT TO CONFRONT HIS ACCUSERS WAS VIOLATED WHEN THE PROSECUTOR COMMITTED PROSECUTORIAL MISCONDUCT BY THREATENING A WITNESS, FORCING HER TO BE UNCOOPERATIVE.

{¶34} In his fourth assignment of error, Mr. Ross argues prosecutorial misconduct deprived him of a fair trial. He argues the reason his girlfriend did not testify was (1) she feared the State would prosecute her if she contradicted her out-of-court statements at trial, and (2) the State refused to offer her immunity for her testimony. According to Mr. Ross, the prosecutor threatened his girlfriend with jail time to extract additional information from her during a proffer she made at the police station. He alleges those threats amounted to misconduct and resulted in a violation of his constitutional rights because he was unable to cross-examine his girlfriend at trial. According to Mr. Ross, his girlfriend "was the main State witness[,]" and he would not have been convicted but for her statements.

{¶35} "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6. "The defendant must show that, but for the prosecutor's misconduct, the trier of fact would not have convicted him." *State v. Dukles*, 9th Dist. Medina No. 12CA0100-M, 2013-Ohio-5263, ¶ 33. Because the "touchstone of the analysis" is the fairness of the trial and not the culpability of the prosecutor, *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, "[a] reviewing court [must] consider the trial record as a whole, and [must] ignore harmless errors 'including most constitutional violations,'" *Knight* at ¶ 6, quoting *State v. Lott*, 51 Ohio St.3d 160, 166 (1990).

{¶36} This Court already has determined that, even without Mr. Ross's girlfriend's out-of-court statements, the remaining evidence against him constitutes overwhelming proof of his

guilt.  *See* Discussion of Assignment of Error I, *supra*.  Assuming without deciding the prosecutor engaged in misconduct, Mr. Ross cannot demonstrate resulting prejudice.  *See Dukles* at ¶ 33.  As such, his fourth assignment of error is overruled.

MR. ROSS'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN PROVIDING THE JURY WITH THE TRANSCRIPTS OF THE STATE'S WITNESSES ONLY.

**{¶37}**  In his second assignment of error, Mr. Ross argues the trial court erred when it provided the jury with transcripts of trial testimony from March 2020.  For the following reasons, this Court rejects his argument.

**{¶38}**  Mr. Ross's trial began in March 2020.  Before the State completed its case-in-chief, the trial court continued the trial due to the global pandemic.  The trial did not resume until August 2020.  At that time, the trial court informed the jury all witness testimony from March 2020 had been transcribed and the court would "allow [the jury] access to the transcripts * * * if [the jury] [found] it necessary to refresh [their] recollection of what [they] heard five months ago."  The court told the jury they would not be required to review the transcripts, but the transcripts would be available if they decided to do so.

**{¶39}**  Mr. Ross argues the trial court abused its discretion when it allowed the jury access to the transcripts.  He argues there was a danger the transcripts would result in the jury giving more weight to the State's witnesses, as they were not provided with transcripts of any defense witness testimony.  He also argues there was a danger the jury would "apprehend the testimony out of context" because the State introduced the transcribed testimony at the beginning of the trial, but the jury would be reviewing it at the end of the trial.

**{¶40}**  Upon review, this Court rejects Mr. Ross's assignment of error for three reasons.  First, at no point before the jury returned their verdicts did he object to the trial court making

transcripts available to the jury. Instead, Mr. Ross raised the issue at the start of the mitigation phase of his trial in the form of a motion for a mistrial. He argued it was his impression no transcripts would be given to the jury until the jury asked to review specific testimony and he had the opportunity to object to their requests on "a case-by-case basis." Mr. Ross has not addressed his failure to object to the transcripts before the jury reached its verdict. To the extent his failure to object could be construed as a forfeiture, Mr. Ross has not argued plain error on appeal, and this Court will not construct an argument on his behalf. *See In re J.T.*, 9th Dist. Summit No. 30223, 2022-Ohio-3466, ¶ 20.

{¶41} Second, assuming without deciding Mr. Ross preserved his argument through a motion for mistrial, he has not argued the trial court erred by overruling that motion. His brief assumes a merits review on the trial court's underlying decision to provide the jury with transcripts. He has not addressed the trial court's mistrial ruling or engaged in any analysis with respect the caselaw that applies in the mistrial context. *See State v. Grether*, 9th Dist. Summit No. 28977, 2019-Ohio-4243, ¶ 25. Once again, this Court will not construct an argument on his behalf. *See State v. McKinney*, 9th Dist. Summit No. 24430, 2009-Ohio-2225, ¶ 21.

{¶42} Finally, Mr. Ross's entire argument is speculative as it rests on the assumption the jury reviewed the transcripts from the March 2020 proceedings. The fact that the trial court made the transcripts available to the jury does not equate to evidence the jury reviewed those transcripts. Indeed, the trial court specifically informed the jury they would not be required to review the transcripts. "It is well-settled that 'speculation cannot prove prejudice.'" *State v. Kirkland*, 9th Dist. Lorain No. 19CA011485, 2022-Ohio-4325, ¶ 15, quoting *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 54. For the foregoing reasons, Mr. Ross's second assignment of error is overruled.

MR. ROSS'S ASSIGNMENT OF ERROR III

[MR. ROSS] DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL
AS GUARANTEED BY THE SIXTH AMENDMENT.

**{¶43}** In his third assignment of error, Mr. Ross argues he received ineffective assistance of counsel. Upon review, this Court rejects his argument.

**{¶44}** To prevail on a claim of ineffective assistance of counsel, Mr. Ross must establish (1) his counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) but for his counsel's deficient performance the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A deficient performance is one that "fall[s] below an objective standard of reasonable representation." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. A court, however, "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). In addition, to establish prejudice, Mr. Ross must show that there existed "a reasonable probability that, but for his counsel's errors, the outcome of the proceeding would have been different." *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 138.

**{¶45}** Mr. Ross argues he received ineffective assistance of counsel because his counsel failed to move for a mistrial based on the global pandemic. He argues the jurors were "undoubtedly concerned" about contracting Covid-19, losing their jobs, and caring for their children and family members. He also argues it was unrealistic to expect the jury to be able to focus on his case when the courtroom "looked like a military zone clad with protective measures * * *." According to

Mr. Ross, his counsel's failure to request a mistrial under these "unprecedented circumstances" cost him his right to a fair trial.

**{¶46}** "Mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127 (1991). "The essential inquiry on a motion for mistrial is whether the substantial rights of the accused [have been] adversely affected." *Grether*, 2019-Ohio-4243, at ¶ 25, quoting *State v. Edwards*, 9th Dist. Summit No. 28164, 2017-Ohio-7231, ¶ 13. "The decision as to whether to move for a mistrial is trial strategy." *State v. Wharton*, 9th Dist. Summit No. 23300, 2007-Ohio-1817, ¶ 44. Moreover, "[s]peculation * * * is insufficient to establish ineffective assistance of counsel." *State v. Depetro*, 9th Dist. Medina No. 21CA0053-M, 2022-Ohio-2249, ¶ 19.

**{¶47}** When the jury reconvened in August 2020, the trial court addressed the pandemic on the record. The trial court told the jury the courtroom had been outfitted with protective measures in consultation with the Health Department. The trial court also told the jury: "[w]e [would not] be bringing you back here if we [could not] convince ourselves, at least, that [we have] done everything we can to protect you and everyone else in this room." The trial court discussed in great detail the types of barriers that had been erected, the protective face wear that would be required in the courthouse, and the steps that would be taken to ensure social distancing. Following a lengthy discussion to that effect, the trial court specifically asked the jurors whether anyone was so concerned about the pandemic that they would not be able to fairly listen and participate in the trial. The court asked:

> Is there somebody here who's sitting thinking, you know, "All I'm gonna do is sit here worrying about catching this from the person next to me or one of these lawyers" or, you know, "I won't be able to even think about this. This is just -- I'm gonna be uncomfortable the whole time worrying about that"? Is there anybody here who that's an issue for?

When no one responded affirmatively, the trial court went on to address other matters and the trial proceeded.

{¶48} The record supports the conclusion the trial court thoroughly addressed the pandemic with the jurors and gave them the opportunity to express any discomfort they might have about remaining on the jury. Mr. Ross's argument that the jurors were unable to concentrate and "undoubtedly concerned" about continuing to serve in light of the pandemic is wholly speculative. *See id.* His counsel may well have decided a motion for mistrial would be unlikely to succeed, given the protective measures the trial court put in place and the efforts it made to ensure the jurors were comfortable serving. *See Wharton*, 2007-Ohio-1817, at ¶ 44. This Court will not second-guess strategic decisions made by trial counsel. *See State v. Miller*, 9th Dist. Summit No. 23240, 2007-Ohio-370, ¶ 10. Because Mr. Ross has not set forth a viable claim of ineffective assistance of counsel, this Court rejects his argument to the contrary. His third assignment of error is overruled.

MR. ROSS'S ASSIGNMENT OF ERROR V

MR. ROSS WAS DEPRIVED THE RIGHT TO A FAIR TRIAL UNDER THE STATE AND FEDERAL DUE PROCESS CLAUSES AS A RESULT OF THE TRIAL COURT'S ERRONEOUS JURY INSTRUCTIONS.

{¶49} In his fifth assignment of error, Mr. Ross argues the trial court erred in its instructions to the jury. Specifically, he argues the trial court should not have instructed the jury on complicity or issued a flight instruction. Upon review, this Court rejects his arguments.

{¶50} "[A] trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable

to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 240. "This Court reviews a trial court's decision to give or decline to give a particular jury instruction for an abuse of discretion under the facts and circumstances of the case." *State v. Sanders*, 9th Dist. Summit No. 24654, 2009-Ohio-5537, ¶ 45. The abuse of discretion standard implies that a trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

Complicity

**{¶51}** "[A] defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is 'stated * * * in terms of the principal offense' and does not mention complicity." (Alteration sic.) *State v. Herring*, 94 Ohio St.3d 246, 251 (2002), quoting R.C. 2923.03(F). "A complicity instruction is proper if 'the evidence adduced at trial could reasonably be found to have proven the defendant guilty as an aider and abettor[.]'" *State v. Simpson*, 9th Dist. Lorain Nos. 12CA010147, 12CA010148, 2013-Ohio-4276, ¶ 33, quoting *State v. Perryman*, 49 Ohio St.2d 14 (1976), paragraph five of the syllabus. For a person to be convicted of complicity by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime * * *." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "Further, the evidence must show that the defendant expressed concurrence with the unlawful act or intentionally did something to contribute to an unlawful act." *State v. White*, 9th Dist. Summit Nos. 23955, 23959, 2008-Ohio-2432, ¶ 29.

**{¶52}** Mr. Ross has not argued the evidence adduced at trial was insufficient to prove his guilt under a theory of complicity. Instead, he argues reversible error occurred when the State changed its theory of the case. He notes the State initially theorized he was the shooter but later argued he was complicit in the shootings. Citing *Thompson v. Calderon*, 120 F.3d 1045, 1059 (9th Cir.1997), Mr. Ross argues "[t]his flip flopping of theories of the offense was inherently unfair[,]" and deprived him of his right to a fair trial.

**{¶53}** This case is unlike *Thompson*, in which the prosecutor pursued fundamentally inconsistent theories and "presented markedly different and conflicting evidence" at different trials held against two codefendants. *Id.* at 1056. Even in opening statements, the prosecutor here advised the jury the State was "not saying that [Mr. Ross] acted alone." The prosecutor told the jury Mr. Ross "was part and parcel of [the murders] from the beginning to the execution," "he cooperated[,]" and he was "right there when [the murders] happen[ed.]" While the State charged Mr. Ross as a principal offender, "R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense." *Herring*, 94 Ohio St.3d at 251. *See also State v. A.W.M.*, 10th Dist. Franklin No. 18AP-523, 2020-Ohio-4707, ¶ 49, quoting *State v. Tuff*, 11th Dist. Lake Nos. 2010-L-082, 2010-L-083, 2011-Ohio-6846, ¶ 53 ("[A]n instruction on complicity is justified when the evidence could be interpreted to support alternative findings as to the exact role of the defendant."). Mr. Ross has not shown error resulted from the State's choice to pursue the alternative theory of complicity against him. *See State v. Walton*, 8th Dist. Cuyahoga No. 88358, 2007-Ohio-5070, ¶ 20. Nor has he made any attempt to explain how he would have defended himself differently had he known sooner the State would be arguing complicity. *See Herring* at 251. Because Mr. Ross has not shown the trial court erred by instructing the jury on complicity, this Court rejects his argument.

Flight Instruction

**{¶54}** "[E]vidence of flight is admissible as it tends to show consciousness of guilt." *State v. Villa*, 9th Dist. Lorain No. 05CA008773, 2006-Ohio-4529, ¶ 29. "[A] jury instruction on flight is appropriate if there is sufficient evidence in the record to support the charge." *Id.* "[T]he record must contain evidence from which reasonable minds might reach the conclusion sought by the instruction." *State v. Ammons*, 9th Dist. Lorain No. 20CA011605, 2022-Ohio-1902, ¶ 31.

**{¶55}** Mr. Ross argues a flight instruction was not warranted because there was no evidence of flight and he "was already incarcerated on another matter when arrested on this matter." Yet, even assuming the trial court erred by issuing a flight instruction, the record reflects that error was harmless. *See State v. Tyler*, 9th Dist. Summit No. 29225, 2019-Ohio-4661, ¶ 53.

**{¶56}** The trial court specifically instructed the jury:

> If you find that the facts do not support the defendant left the scene or if you find that some other motive prompted [his] conduct or if you are unable to decide what [his] motivation was, then you should not consider this evidence for any purpose.

> However, if you find the facts support the defendant engaged in such conduct, if you decide [he] was motivated by a consciousness of guilt, you may, but you're not required to -- but you may consider that evidence in deciding whether [he] is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

The court's instruction framed any consciousness of guilt finding as entirely permissive and applicable only if the jury believed Mr. Ross had chosen to flee the scene due to a consciousness of guilt. The jury also heard significant testimony against Mr. Ross, including that (1) he and M.L. were involved in drug dealings; (2) he repeatedly spoke to M.L. shortly before his murder, and likely used a burner phone to communicate with him immediately before the shooting; (3) his cell phone history, call records, and cellular footprint placed him at the scene; (4) he lied about his whereabouts before, during, and after the murders; (5) he encouraged his girlfriend, who originally

was his alibi, not to cooperate with the police; (6) he had access to a car that matched the one seen fleeing the scene immediately after the shooting; and (7) he instructed the owner of that car to report it stolen. Given the nature of the court's flight instruction and the overwhelming evidence against Mr. Ross, any error the trial court may have committed in issuing its instruction was harmless beyond a reasonable doubt. *See* at ¶ 53. Accordingly, Mr. Ross's fifth assignment of error is overruled.

MR. ROSS'S ASSIGNMENT OF ERROR VI

THE TRIAL COURT'S ERRORS, WHEN TAKEN TOGETHER AND CONSIDERING THE CUMULATIVE ERROR DOCTRINE, DEPRIVED [MR. ROSS] OF A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION SIXTEEN OF THE OHIO CONSTITUTION DUE PROCESS CLAUSES.

{¶57} In his sixth assignment of error, Mr. Ross argues cumulative error deprived him of a fair trial. "Under the doctrine of cumulative error, 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, ¶ 156, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 223.

{¶58} Mr. Ross has not established that the trial court committed multiple errors in this case. The doctrine of cumulative error, therefore, is not applicable. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132. Mr. Ross's sixth assignment of error is overruled.

THE STATE'S ASSIGNMENT OF ERROR I

THE TRIAL COURT'S SENTENCE IS CONTRARY TO LAW BECAUSE THE COURT FAILED TO IMPOSE PRISON TERMS FOR THE TWO MOST SERIOUS FIREARM SPECIFICATIONS AS REQUIRED BY R.C. 2929.14(B)(1)(G).

{¶59} In its first assignment of error, the State argues the trial court erred when it failed to sentence Mr. Ross on the firearm specifications linked to his two most serious offenses. This Court agrees.

{¶60} In reviewing a felony sentence, "[t]he * * * standard for review is not whether the sentencing court abused its discretion." R.C. 2953.08(G)(2). "[A]n appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence" that: (1) "the record does not support the trial court's findings under relevant statutes[,]" or (2) "the sentence is otherwise contrary to law." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶61} The jury found Mr. Ross guilty of each of the firearm specifications linked to his various counts of aggravated murder, murder, felony, murder, and felonious assault. When sentencing Mr. Ross, the trial court ordered him to serve a three-year sentence on the firearm specification for the aggravated murder of M.L. The trial court merged the remainder of his firearm specifications with that three-year sentence, including the firearm specification for the murder of F.T. The State argues the trial court erred when it failed to sentence Mr. Ross on both the firearm specification linked to M.L.'s aggravated murder and the firearm specification linked to F.T.'s murder. The State argues, by statute, the trial court was required to sentence Mr. Ross on both specifications and order the consecutive service of those three-year terms.

{¶62} Initially, this Court addresses Mr. Ross's argument that the State forfeited its argument by failing to object in the lower court. The record reflects the State initially asked the trial court to sentence Mr. Ross on both the firearm specification linked to M.L.'s aggravated

murder and the firearm specification linked to F.T.'s murder. The State specifically asked the court to impose consecutive service on those specifications "based on the law." When the trial court pronounced its sentence at the conclusion of the sentencing hearing and merged the firearm specifications, the State did not object. Even so, the State filed a motion to correct sentence before the trial court journalized its sentencing order. In its motion, the State specifically argued the law required the trial court to impose separate, consecutive sentences on Mr. Ross's firearm specifications for the aggravated murder of M.L. and the murder of F.T. The trial court denied the State's motion before journalizing its sentencing order. Thus, the trial court specifically ruled on this issue at the behest of the State. Although the State failed to contemporaneously object when the trial court orally pronounced its sentence, this Court must conclude the State sufficiently preserved its argument for appeal. *Compare State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus (appellate courts generally will not consider error if complaining party failed to alert trial court to an error at a time when it could have been avoided or corrected). Accordingly, we reject Mr. Ross's argument that the State is limited to plain-error review.

{¶63} "In the instance of multiple firearm specifications, a defendant generally will be subject to only one three-year sentence 'for felonies committed as part of the same act or transaction.'" *State v. Rouse*, 9th Dist. Summit No. 28301, 2018-Ohio-3266, ¶ 10, quoting former R.C. 2929.14(B)(1)(b). "The general rule does not apply, however, when R.C. 2929.14(B)(1)(g) controls." *Rouse* at ¶ 10. That statute provided, in relevant part:

> If an offender is convicted of * * * two or more felonies, if one or more of those felonies are aggravated murder[ or] murder * * *, and if the offender is convicted of * * * a [three-year firearm] specification * * * in connection with two or more of the felonies, the sentencing court *shall impose on the offender the [three-year] prison term * * * for each of the two most serious specifications of which the offender is convicted * * ** and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

(Emphasis added.) R.C. 2929.14(B)(1)(g).[1] "Thus, under R.C. 2929.14(B)(1)(g), a trial court is required to order consecutive service of a defendant's specifications." *Rouse* at ¶ 10, citing *State v. Urconis*, 9th Dist. Wayne No. 16AP0061, 2017-Ohio-8515, ¶ 8-10. *Accord State v. Bollar*, Slip Opinion No. 2022-Ohio-4370.

{¶64} The jury found Mr. Ross guilty of a three-year firearm specification in connection with both his aggravated murder charge and his murder charge. Pursuant to Section 2929.14(B)(1)(g), the trial court was required to impose a three-year prison term on Mr. Ross for each of those specifications and run those terms consecutively. *See Rouse* at ¶ 10. Because the trial court failed to do so, that portion of its sentencing entry is contrary to law. This Court, therefore, vacates Mr. Ross's sentence to the extent the trial court merged his three-year firearm specifications for the aggravated murder of M.L. and the murder of F.T. The matter is remanded for resentencing on those specifications. *See* R.C. 2953.08(G). The State's first assignment of error is sustained.

THE STATE'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S SENTENCE IS CONTRARY TO LAW BECAUSE THE COURT IMPROPERLY MERGED FIREARM SPECIFICATIONS AS ALLIED OFFENSES OF SIMILAR IMPORT EVEN THOUGH THE UNDERLYING CONVICTIONS FOR THOSE SPECIFICATIONS WERE NOT ALLIED OFFENSES.

{¶65} In its second assignment of error, the State argues the trial court erred when it merged several of Mr. Ross's firearm specifications as allied offenses of similar import. According to the State, the trial court should not have merged Mr. Ross's firearm specifications for the murder of F.T., tampering with evidence, and having a weapon under disability with his

---

[1] The language employed in former Revised Code Section 2929.14(B)(1)(g) is identical to the language employed in the current version of the statute.

firearm specification for the aggravated murder of M.L. For the following reasons, this Court rejects the State's argument.

{¶66} Insofar as the State argues the trial court should not have merged Mr. Ross's firearm specification for the murder of F.T. with his firearm specification for the aggravated murder of M.L., this Court concludes its argument is moot. We have already determined the trial court erred by not sentencing Mr. Ross on both of those specifications. *See* Discussion of the State's Assignment of Error I, *supra*. As such, we decline to address the State's argument in that regard. *See* App.R. 12(A)(1)(c).

{¶67} The trial court also merged the one-year firearm specification linked to Mr. Ross's tampering conviction and the one-year firearm specification linked to his weapon under disability conviction with the firearm specification linked to his aggravated murder conviction. The State argues the trial court erred by doing so because Mr. Ross's underlying convictions for aggravated murder, tampering with evidence, and having a weapon under disability were not allied offenses of similar import. According to the State, those convictions had separate, identifiable harms.

{¶68} The record reflects the State did not object when the trial court merged Mr. Ross's firearm specifications for tampering and having a weapon under disability with his firearm specification for aggravated murder. Nor did the State challenge that aspect of the trial court's sentence when it filed its motion to correct sentence. Because the State failed to make an allied offense argument of this nature in the lower court, it forfeited all but plain error. *See State v. Andrews*, 9th Dist. Summit No. 2020-Ohio-2703, ¶ 51. The State, however, has not set forth a plain error argument in its brief. "Although [it] has attempted to raise plain error in [its] reply brief, 'an appellant may not assert a claim of plain error for the first time in a reply brief.'" *Id.*, quoting *State v. Irvine*, 9th Dist. Summit No. 28998, 2019-Ohio-959, fn.1. *Accord State v.*

*Osborne*, 9th Dist. Lorain No. 15CA010727, 2017-Ohio-785, ¶ 8.  Accordingly, we reject the State's argument that the trial court erred by merging Mr. Ross's firearm specifications for tampering and having a weapon under disability with his firearm specification for aggravated murder.  The State's second assignment of error is overruled.

## III.

**{¶69}** Mr. Ross's assignments of error are overruled.  The State's first assignment of error is sustained, and its second assignment of error is overruled.  The judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

JENNIFER HENSAL
FOR THE COURT

SUTTON, P. J.
STEVENSON, J.
CONCUR.

APPEARANCES:

GIOVANNA V. BREMKE, Attorney at Law, for Appellant.

J.D. TOMLINSON, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.